1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CHURCH OF THE CELESTIAL HEART, et al., | Case No. 1:23-cv-00545-SAB |
| Plaintiffs, | ORDER DENYING DEFENDANTS' MOTION TO DISMISS |
| v. | (ECF Nos. 1, 12, 16, 17, 21) |
| MERRICK GARLAND, et al., | |
| Defendants. | |

## I.

## INTRODUCTION

Currently before the Court is Defendants' motion to dismiss, filed on July 17, 2023. (ECF No. 12.)  The Court held oral argument on the motion on September 27, 2023.  (ECF No. 21.)  Based on the moving, opposition, and reply papers, the operative complaint, as well as the Court's file, the Court issues the following order denying Defendants' motion to dismiss.

## II.

## BACKGROUND

The Church of the Celestial Heart ("Celestial Heart"), Kai Karrel ("Karrel"), Jade J. Osborne ("Osborne"), Daniel Pozas ("Pozas"), and Sara Mintzer ("Mintzer") (hereafter collectively "Plaintiffs"), filed this action on April 6, 2023.  (Compl., ECF No. 1.)  Plaintiffs name the following Defendants: (1) Merrick Garland, identified as Attorney General of the

United States and Chief Law Enforcement Officer of the United States; (2) Anne Milgram, identified as the Administrator of the U.S. Drug Enforcement Administration ("DEA"); and (3) Alejandro Mayorkas, identified as Secretary of the U.S. Department of Homeland Security ("DHS"), and official responsible for border protection through the U.S. Customs and Border Protection ("CBP") and Homeland Security Investigations. (Compl. ¶¶ 33-35.)

### A. The Church of the Celestial Heart

According to the complaint, Plaintiff Celestial Heart is a California non-profit religious corporation that has approximately 350 members who share the same religious beliefs as Plaintiffs. (Compl. ¶¶ 2, 8.) While independent, it is based on the doctrine of the Santo Daime religion which was founded in the 1930's by Mestre Raimundo Irineu Serra. (Id.) Like the Santo Daime religion, Celestial Heart is a syncretic religion that incorporates several religions and spiritual traditions such as esoteric Catholicism, Kardecist Spiritism, Brazilian Candomblé, Umbanda and Umbandaime, the mediumistic teachings of the Brazilian Chico Xavier, and the indigenous Brazilian shamanism as brought forth by the Kaxinawa and Yawanawa indigenous tribes of Acre, Brazil. (Id.) Celestial Heart was formed in order to expand the syncretic nature of the Santo Daime religion and offer its teachings to an English-speaking audience. (Compl. ¶ 9.) In addition to using the Portuguese books of prayer (Hinarios), the Church also utilizes English translations of these hymns and its own book of channeled prayers called 'Prayerful Heart,' which has over 250 prayers. (Id.)

Celestial Heart, and members of Celestial Heart, seek to import and use their sacramental tea (also known as Daime or ayahuasca), which contains trace amounts of a Schedule I chemical, into the United States for religious ceremonies. (Compl. ¶ 2.) Plaintiffs proffer the sacramental practice of using Daime dates back more than 2,000 years, and Celestial Heart honors these ancient traditions, pays its respect to elders and teachers, and have their full support to carry this work onward. (Compl. ¶ 8.) Celestial Heart and its members believe that with the ceremonial use of their sacrament, they are able to connect to the "Astral," a spiritual plane where they can access angels, archangels, and a multitude of spirits and guides, ignite their divine connection to God, and through this communion, come to a profound sense of healing, peace, and

1   understanding that brings about transformation in all levels of human existence.  (Compl. ¶ 10.)

2   Celestial Heart and its members believe their sacrament to be divinate, meaning it has been

3   bestowed upon humanity in a Divine manner, meant to awaken and bring about reconnection to

4   Great Spirit, and consider their sacrament to be Divine in itself, relating to the sacrament as the

5   spirit of Mother Earth, and esoterically as the sacramental blood of Christ.  (Compl. ¶ 11.)

6   Partaking with the Daime is an essential and foundational practice within their faith.  (Id.)

7   **B.      Plaintiff Members of the Church of the Celestial Heart**

8   Plaintiff Karrel is the founder of Celestial Heart and serves as the lead pastor or Padrinho;

9   became an official member of the Santo Daime church in 2016; and has been consecrating the

10   sacrament for more than ten (10) years.  Additionally Karrel's second line of religious study is

11   the line of Barquinha, and is one of the first non-Brazilians to be initiated within this order.

12   Karrel has studied theology and comparative religion since the age of twenty and has lived in an

13   ashram for over thirteen (13) years, studying various religions and spiritual practices, leading

14   retreats, religious ceremonies, and spiritual events.  (Compl. ¶¶ 14.)

15   Plaintiff Osborne is the spouse of Karrel; is a board member of Celestial Heart; serves as

16   a lead pastor or Madrinha; received her first Celestial Heart star initiation in February 2020; her

17   current affiliation to Fraternidade do Coração in December 2022; has been consecrating the

18   sacrament for more than five (5) years; has been a member of the Celestial Heart for the past five

19   (5) years, where she studies and practices the lines of Santo Daime and Umbandaime; and

20   believes the sacrament, ayahuasca, provides a direct connection to God.  (Compl. ¶¶ 18, 21.)

21   Plaintiff Pozas became an active member of Celestial Heart; chose to act as a board

22   member; and alleges partaking in the sacrament, ayahuasca, within the ceremonial rituals of the

23   Church has connected him to Spirit and filled his life with meaning, purpose, and love.  (Compl.

24   ¶ 24.)  Pozas started his religious study of Santo Daime eight (8) years ago, and in 2016 he

25   formally become a member of the Santo Daime; became an initiated, starred member of Celestial

26   Heart in 2021; and is one of the lead guardians of the Church, a server of the sacrament, and a

27   practicing healer assisting and helping with carrying out the ceremony.  (Compl. ¶ 24-27.)

28   Plaintiff Mintzer is an initiated member and board member of Celestial Heart; has been a

member since January 2021; was initiated in 2022; and studies directly from the teachings of Padrinho Karrel and Madrinha Osborne and follows the teachings of Celestial Heart, Santo Daime, Umbandaime, Umbanda, and Candomblé. (Compl. ¶ 29.)

### C.      The August 2021 Seizure and Arrest and Allegations of Substantial Burden

In early August, 2021, Celestial Heart sent a package via DHL containing its sacramental tea, ayahuasca, to Osborne. (Compl. ¶ 37.) On August 13, 2021, this package was seized first by agents of the Defendant U.S. Department of Homeland Security ("DHS"). (Id.) The package was tested for controlled substances, returning a positive test result for N, N-Dimethyltyptamine ("DMT"), which ayahuasca is known to contain in trace amounts. (Id.) Plaintiffs allege this confiscation and testing were perpetrated without providing any due process to Plaintiffs before or after their holy tea was seized. (Id.) Agents of the DHS confiscated the sacrament and sent it to the DHS office in Fresno, California., and subsequently, DHS Special Agent Jim Johnson contacted the Tulare County Sheriff's Department to inform local law enforcement about the seizure and content of the package. (Id.)

Following DHS' instigation of this case, Tulare County Sheriff's Department Detective William MacElvaine followed up on the DHS contact by investigating Plaintiff Osborne online. (Compl. ¶ 38.) Plaintiffs allege that while Detective MacElvaine's probable cause statement indicates he understood ayahuasca was a "South American psychoactive brew used in social and ceremonial spiritual medicine among indigenous people[,]" despite this clear reference to the religious use of ayahuasca, neither the Defendants nor Detective MacElvaine did any research into whether Celestial Heart or Osborne had a religious basis for their use of ayahuasca. (Id.)

In the summer of 2021,[1] following the execution of a search warrant by the Sheriff's Department, Osborne was arrested on suspicion of violating California Health and Safety Code § 11377 (possession of any compound or substance containing DMT) and California Health and Safety Code § 11378 (possession of DMT for sale). (Compl. ¶¶ 22, 38.) Osborne was

---

[1] While the complaint references 2020, as indicated in the motion to dismiss, the parties have met and conferred and confirmed that the complaint should state 2021, and the Court proceeds on the basis that the arrest occurred in 2021. (See Compl. ¶ 22; ECF No. 12-1 at 10 n.4.)

1   incarcerated following her arrest until such time as she posted bond.  (Compl. ¶ 38.)  Since

2   Osborne's arrest and incarceration, she has not been formally charged with a crime, however,

3   Plaintiffs proffer the statute of limitations allows formal charges to be filed any time before

4   September 2, 2024.  (<u>Id.</u>)  Plaintiffs allege on information and belief, that Plaintiffs' sacred

5   sacramental tea contained in that August 2021 package has been destroyed by state and/or

6   federal law enforcement.  (<u>Id.</u>)

7        Plaintiffs additionally allege that concurrently, DHS, and its subdivision CBP, have

8   engaged in a pattern and practice of seizing and destroying countless other shipments of

9   sacramental ayahuasca that have come into the United States since 2020.  (Compl. ¶ 39.)

10   Plaintiffs allege that following the seizure in this case by DHS, agents of DHS instigated

11   additional criminal investigations and collaborated with state law enforcement agencies to

12   threaten criminal prosecution against Plaintiff Osborne.  (<u>Id.</u>)  Plaintiffs contend that the

13   increased seizures of ayahuasca in the United States, the prosecution or threatened prosecution of

14   individuals devoted to the religious use of ayahuasca including Osborne, and the specific seizure

15   of the Church's sacrament have a chilling effect on Plaintiffs' ability to practice their religion

16   without fear of persecution resulting in a substantial burden on Plaintiffs' exercise of their

17   religious beliefs.  (<u>Id.</u>)

18        Plaintiffs also allege that Defendants are collaborating with state law enforcement in

19   other cases to prosecute churches and their members who use ayahuasca in a religious context,

20   and that Plaintiffs are aware of several such prosecutions that began with seizures of ayahuasca

21   by DHS, which then led to DEA or other agents of the Defendants collaborating with state law

22   enforcement.  (Compl. ¶ 40.)  Specifically, Plaintiffs state known criminal prosecutions of those

23   using ayahuasca for religious purposes have occurred in Arizona, California, Colorado, Florida,

24   Michigan, New Mexico, New York, Oregon, Tennessee, and Texas.  (<u>Id.</u>)

25        Overall, Celestial Heart alleges it has suffered both financial and spiritual loss having its

26   sacrament confiscated and destroyed; that it is substantially burdened by being forced to choose

27   between following the tenets of its religion or being coerced to act contrary to its religious beliefs

28   by the threat of civil or criminal sanctions; and that it intends to continue importing, possessing,

1   and using its sacrament, for without its sacrament, the Church cannot provide essential services.

2   (Compl. ¶ 12.)  Plaintiffs allege the raid and arrest occurred in cooperation with state and federal

3   agents, including the Defendants; and that as a result of the chilling effect of her arrest and the

4   continued threat of prosecution, for a certain period of time, Osborne was not able to fully

5   participate in Church activities.  (Compl. ¶ 22.)

6        Plaintiffs Karrel, Osborne, Pozas, and Mintzer, similarly allege that ayahuasca is an

7   essential sacrament for each, without which they cannot practice their religion, and given the

8   confiscation and destruction of the Church's sacrament, as well as the arrest of Osborne, allege

9   they are substantially burdened by being forced to choose between following the tenets of their

10  religion or being coerced into acting contrary to their religious beliefs by the threat of civil or

11  criminal sanctions.  (Compl. ¶¶ 17, 23, 28, 32.)  These Plaintiffs similarly allege that despite the

12  substantial burden of the threat of legal sanctions, they continue to use the sacrament within

13  ceremonies.  (Id.)

14      **D.**    **The Complaint and Motion to Dismiss**

15       Plaintiffs' stated claim for relief is brought pursuant to the Religious Freedom

16  Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(c), 2000bb(4).  (Compl. at 1, ¶¶ 100-101.)

17  While the statute is not mentioned elsewhere or cited as a basis for a separate cause of action in

18  the body of the complaint, the caption indicates Plaintiffs seek review of agency action pursuant

19  to 5 U.S.C. § 702.  (Compl. at 1.)  The caption also indicates Plaintiffs seek declaratory relief

20  pursuant to 28 U.S.C. §§ 2201-2202; and injunctive relief pursuant to Federal Rule of Civil

21  Procedure 65.  (Id.)  Plaintiff indicates the Court has jurisdiction under 28 U.S.C. § 1346 (United

22  States as defendant) and 5 U.S.C. § 706, to grant declaratory relief and to issue preliminary and

23  permanent injunctions and under the Administrative Procedures Act, 5 U.S.C. § 701.  (Compl. ¶

24  4.)

25       Plaintiffs seek declaratory and injunctive relief against, including: (1) a declaratory

26  judgment that the actions described in the complaint violated Plaintiffs' rights under RFRA; (2) a

27  declaratory judgment that Defendants' actions described in this complaint, including the

28  interception of Celestial Heart's sacramental tea, and the continuing threat of prosecution of

Plaintiffs and Celestial Heart's members in the United States who wish to engage in taking the sacrament, violate the RFRA, 42 U.S.C. § 2000bb-2000bb(4); (3) a preliminary and permanent injunction enjoining Defendants from arresting, prosecuting, or threatening Plaintiffs and members of Celestial Heart with arrest, prosecution and or imprisonment for importing, distributing, possessing, and ingesting Celestial Heart's sacramental tea solely at Celestial Heart services; and (4) an order that within thirty (30) days after the date of issuance of declaratory relief, the parties present this Court with a plan to effectuate the importation, distribution, possession, and accounting for Celestial Heart's sacramental tea consistent with the rights of Celestial Heart's members to use their sacramental tea in ceremonies; and fees and costs. (Compl. ¶ 106.)

On July 17, 2023, Defendants filed the instant motion to dismiss. (Defs.' Mot. Dismiss ("Mot."), ECF No. 12.) On July 18, 2023, the motion was referred to the assigned Magistrate Judge for the preparation of findings and recommendations and/or other appropriate action. (ECF No. 13.) On July 19, 2023, the Court set the motion for hearing to be held on August 30, 2023, in Courtroom 9. (ECF No. 15.) On July 31, 2023, Plaintiffs filed an opposition to the motion to dismiss. (Pls.' Opp'n Mot. ("Opp'n"), ECF No. 16.) On August 10, 2023, Defendants filed a reply brief. (Defs.' Reply Opp'n ("Reply"), ECF No. 17.)

On August 22, 2023, the Court granted a motion to continue the hearing on the motion, and set the continued hearing for September 27, 2023. (ECF No. 19.) On September 27, 2023, the Court held a hearing on the motion to dismiss. (ECF No. 21.) Jack Silver and Sean McAllister appeared on behalf of Plaintiffs via video. Sarah Suwanda appeared on behalf of Defendants via video.

On October 6, 2023, pursuant to the parties' consent, this action was reassigned to Magistrate Judge Stanley A. Boone for all purposes, including trial and final entry of judgment. (ECF No. 23.)

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# III.

# LEGAL STANDARD

## A.     Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to file a motion to dismiss based upon lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A jurisdictional attack under Rule 12(b)(1) may be either facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack challenges the allegations in the complaint, asserting they are insufficient on their face to invoke federal jurisdiction. Id. A factual attack challenges the truth of the allegations that would otherwise invoke federal jurisdiction. Id.

"In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." Id.; see also St. Clair v. City of Chico, 880 F.2d 199, 201 (1989) ("Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court."); Robinson v. United States, 586 F.3d 683, 685 (9th Cir. 2009) ("A district court may "hear evidence regarding jurisdiction" and "resolv[e] factual disputes where necessary." (quoting Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983))).

"When subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001) (citing Stock West, Inc. v. Confederated Tribes, 873 F.2d 1221, 1225 (9th Cir. 1989)); see also Robinson v. United States, 586 F.3d 683, 685 (9th Cir. 2009) (same); Castillo v. Cartier, No. 118CV01139LJOSAB, 2018 WL 6603864, at *2 (E.D. Cal. Dec. 17, 2018) (same). Further, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## B.     Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on

1    the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."   A

2    motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Navarro

3    v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a motion to dismiss, "[a]ll allegations

4    of material fact are taken as true and construed in the light most favorable to the nonmoving

5    party."  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  The pleading

6    standard under Rule 8 of the Federal Rules of Civil Procedure does not require " 'detailed factual

7    allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me

8    accusation."    Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v.

9    Twombly, 550 U.S. 544, 555 (2007)).   In assessing the sufficiency of a complaint, all well-

10   pleaded factual allegations must be accepted as true.   Iqbal, 556 U.S. at 678-79.   However,

11   "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

12   statements, do not suffice."   Id. at 678.   To avoid a dismissal under Rule 12(b)(6), a complaint

13   must plead "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550

14   U.S. at 570.

15           In deciding whether a complaint states a claim, the Ninth Circuit has found that two

16   principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint

17   "may not simply recite the elements of a cause of action, but must contain sufficient allegations

18   of underlying facts to give fair notice and to enable the opposing party to defend itself

19   effectively."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair

20   to require the defendant to be subjected to the expenses associated with discovery and continued

21   litigation, the factual allegations of the complaint, which are taken as true, must plausibly

22   suggest an entitlement to relief.  Starr, 652 F.3d at 1216.  "Dismissal is proper only where there

23   is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable

24   legal theory."  Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696,

25   699 (9th Cir.1988)).

26           Courts freely grant leave to amend a complaint which has been dismissed.  See Fed. R.

27   Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); Schreiber

28   Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is

1  dismissed for failure to state a claim, leave to amend should be granted unless the court

2  determines that the allegation of other facts consistent with the challenged pleading could not

3  possibly cure the deficiency."); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (same).

## IV.

## DISCUSSION

6  Defendants move for an order dismissing the case with prejudice for lack of standing and

7  for failure to state a claim; or in the alternative, dismissing the case without prejudice or staying

8  the litigation until Plaintiffs apply to the DEA for a religious-based exemption to the Controlled

9  Substances Act.

### A.    RFRA, Separation of Powers, & Pre-Enforcement Actions Generally

11  The Religious Freedom Restoration Act "provides that [the] '[g]overnment shall not

12  substantially burden a person's exercise of religion even if the burden results from a rule of

13  general applicability,' unless the government 'demonstrates that application of the burden to the

14  person—(1) is in furtherance of a compelling governmental interest; and (2) is the least

15  restrictive means of furthering that compelling governmental interest.' " Holt v. Hobbs, 574

16  U.S. 352, 357 (2015) (quoting 42 U.S.C. §§ 2000bb–1(a), (b)).

17  The Supreme Court has stated "the Executive Branch has exclusive authority and

18  absolute discretion to decide whether to prosecute a case." United States v. Nixon, 418 U.S. 683,

19  693 (1974); see also United States v. Banuelos-Rodriguez, 215 F.3d 969, 976–77 (9th Cir. 2000)

20  ("Courts generally have no place interfering with a prosecutor's discretion regarding whom to

21  prosecute, what charges to file, and whether to engage in plea negotiations.") (collecting cases);

22  Stolt-Nielsen, S.A. v. United States, 442 F.3d 177, 183 (3d Cir. 2006) ("Government therefore

23  argues that courts lack jurisdiction to enjoin a criminal prosecution."). Prosecutorial discretion

24  derives from Article II, including the Executive Power Clause, the Take Care Clause, the Oath of

25  Office Clause, and the Pardon Clause. WildEarth Guardians v. United States Dep't of Just., 181

26  F. Supp. 3d 651, 664 (D. Ariz. 2015). "The Framers saw the separation of the power to

27  prosecute from the power to legislate as essential to preserving individual liberty." Id. (quoting

28  In re Aiken Cnty., 725 F.3d 255, 264 (D.C. Cir. 2013)).

"There is an exception to this general rule, however, in order to avoid a chilling effect on constitutional rights."  Stolt-Nielsen, 442 F.3d at 183 (citing Dombrowski v. Pfister, 380 U.S. 479, 486–87 (1965) (threat of criminal prosecution creates the potential for a serious chill upon First Amendment rights); Hynes v. Grimes Packing Co., 337 U.S. 86, 98–99 (1949) (threat of prosecution may deny fishermen the right to earn a livelihood); Truax v. Raich, 239 U.S. 33, 38–39 (1915) (threat of prosecution may lead to an unconstitutional denial of the right to earn a livelihood and to continue employment)).  Thus, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  Oklevueha Native Am. Church of Hawaii, Inc. v. Holder, 676 F.3d 829, 835 (9th Cir. 2012) ("Oklevueha I") (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

**B.      Relevant Statutory and Regulatory Background Underlying CSA**

The Court briefly summarizes the statutory and regulatory background of the Controlled Substances Act, as emphasized by the Defendants in their moving papers.

The Controlled Substances Act, 21 U.S.C. § 801 *et seq*. ("CSA"), regulates the use of certain drugs and other substances, including Schedule I controlled substances—like DMT—which Congress determined have a high risk of abuse and a lack of accepted medical use.  See 21 U.S.C. § 812(b)(1), (c), & Schedule I subheading § (c)(6) ("Dimethyltryptamine").  By passing the CSA, Congress created a regulatory system through which various federal agencies control and monitor the flow of controlled substances into and within the United States, and within this system, DEA exercises authority delegated by the Attorney General to register an applicant who wishes to import, distribute, dispense, or manufacture Schedule I substances like DMT, when doing so is consistent with the public interest.  See 21 U.S.C. §§ 823(b) ("The Attorney General shall register an applicant to distribute a controlled substance in schedule I or II unless he determines that the issuance of such registration is inconsistent with the public interest."), 958(a) (stating similar as to import and export, in relation to public interest and international agreements); 21 C.F.R. § 1301.31.

Defendants proffer any party—including health care professionals, pharmacists, medical researchers, and religious adherents—who wishes to handle a controlled substance must register with DEA.  See 21 U.S.C. §§ 823, 958; 21 C.F.R. §§ 1301.01–1301.52.  Any registrant wishing to import a controlled substance must apply for an import permit each time they wish to do so, and that approved permit must accompany the shipment.  See 21 C.F.R. §§ 1301.34, 1312.11–1312.14.  Defendants proffer this statutorily delegated DEA process is designed to ensure that all controlled substances are safely handled and properly safeguarded to prevent loss, theft, and diversion to illicit use.  See 21 U.S.C. §§ 823, 958.

Following the Supreme Court's decision in Gonzales v. O Centro Espirita Beneficiente União do Vegetal, 546 U.S. 418 (2006) ("O Centro"), the DEA created a separate religious-exemption process open to anyone who wishes to obtain a registration to handle a controlled substance for religious purposes.  The guidance document outlining this process ("DEA Guidance"), first issued in 2009 and updated most recently in 2020, indicates how to submit religious-exemption petitions and what information such petitions should contain.  See DRUG ENF'T ADMIN., DIVERSION CONTROL DIV., EO-DEA007, GUIDANCE REGARDING PETITIONS FOR RELIGIOUS EXEMPTION FROM THE CONTROLLED SUBSTANCES ACT PURSUANT TO THE RELIGIOUS FREEDOM RESTORATION ACT (REVISED) (Nov. 20, 2020), https://perma.cc/3PER-K3L9 ("DEA Guidance") (last accessed November 2, 2023).

Defendants contend that importantly, this religious-exemption process allows DEA to consider the risks of harm posed by the controlled substance and assess an individual's or organization's proposed safeguards for handling that substance in light of the agency's mission to prevent diversion of illegal uses and otherwise protect the public interest, and thus, the DEA Guidance asks petitioners to disclose "each specific religious practice" involving the controlled substance as well as "the amounts, conditions, and locations, of its anticipated manufacture, distribution, dispensing, importation, exportation, use or possession."  DEA Guidance at 1–2.  Defendants state such information allows DEA to evaluate a petitioner's application against the

/ / /

/ / /

security, storage, and record-keeping regulatory requirements imposed on registrants who wish to handle any controlled substance within the CSA's closed regulatory system.[2]

### C.    The Court Shall Deny Defendants' Motion to Dismiss for Lack of Standing

Defendants move to dismiss the action for lack of standing, contending: (i) Plaintiffs fail to allege any genuine threat of imminent prosecution, Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1139 (9th Cir. 2000); (ii) any genuine threat of imminent prosecution would not be fairly traceable to Defendants, Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992); and (iii) Plaintiffs fail to demonstrate associational standing, Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  Defendants argue Plaintiffs' purported fears of future federal prosecution, are primarily supported by alleged action by state actors, lack foundation, and cannot be traced to Defendants' alleged actions.  (Mot. 12.)  Defendants frame Plaintiffs' complaint as relying on allegations of state action by state actors to establish their alleged fear of federal prosecution—despite acknowledging that Defendants have never prosecuted Plaintiffs for possessing or using ayahuasca and have never even threatened to do so. Defendants also argue the alleged harms stem from Plaintiffs' failure to seek a religious exemption from DEA.

### 1.    General Legal Standards

RFRA expressly provides for "[j]udicial relief," in that it provides "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  42 U.S.C. § 2000bb-1(c).  This provision also states that "[s]tanding to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution."  Id.

"[T]he irreducible constitutional minimum of standing contains three elements."  Lujan, 504 U.S. at 560.  "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a

---

[2]  DEA regulations require, *inter alia*, security, storage, and theft/loss avoidance measures, 21 C.F.R. §§ 1301.71–1301.76; record-keeping and inventory regarding importation, receipt, distribution, and disposal of controlled substances, 21 C.F.R. §§ 1304.21–1304.22; and DEA access for inspections and audits, 21 U.S.C. § 880; 2 screening procedures, 21 C.F.R. §§ 1301.90–1301.93.

legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not conjectural or hypothetical.' " Id. (citations omitted).  "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " Id. at 560-61 (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41–42 (1976)).  "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " Id. (quoting Simon, 426 U.S. at 38, 43).

"The standing question [] bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention."  Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does.").  "The 'basic rationale' of the ripeness requirement is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' "  Oklevueha I, 676 F.3d at 835 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)).  "The ripeness inquiry contains both a constitutional and a prudential component."  Oklevueha I, 676 F.3d at 835 (quoting Portman v. Cnty. of Santa Clara, 995 F.2d 898, 902 (9th Cir. 1993)); Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003) ("The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.' " (quoting Reno v. Catholic Social Services, Inc., 509 U.S. 43, 57, n.18 (1993))).

While the "Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' [and] that the issues presented are 'definite and concrete, not hypothetical or abstract[,]' arrest is not necessarily a prerequisite for an individual to challenge the applicability of a criminal statute."  Oklevueha I, 676 F.3d at 835 (quoting Thomas, 220 F.3d at 1139).  Thus, "[w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a

criminal prosecution as the sole means of seeking relief." Oklevueha I, 676 F.3d at 835 (quoting Babbitt, 442 U.S. at 298). "To bring such a 'preenforcement claim,' we require plaintiffs to allege a 'genuine threat of imminent prosecution.' " Oklevueha I, 676 F.3d at 835 (quoting Thomas, 220 F.3d at 1139). In reviewing such a preenforcement claim, courts consider: "(1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question; (2) whether the government has communicated a specific warning or threat to initiate proceedings; and (3) the history of past prosecution or enforcement under the statute." Id.

2.      Plaintiffs Have Sufficiently Alleged a Genuine Threat of Imminent Prosecution

Defendants submit that where, like here (Compl. ¶¶ 2, 12, 17, 23, 28, 32), the alleged harm is the threat of civil or criminal sanctions, there must be a "genuine threat of imminent prosecution." Thomas, 220 F.3d at 1139. While conceding the concrete plan factor, Defendants raise three primary arguments challenging Plaintiffs' standing to bring this action under the remaining two Thomas factors.

**a.      Defendants Concede Concrete Plan Sufficient**

Defendants concede, for the purposes of this motion only, that Plaintiffs have sufficiently pleaded the first factor of "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question," Thomas, 220 F.3d at 1139. (Mot. 12 n.5.) Based on the lack of challenge and the Court's review of the allegations, the Court finds Plaintiffs have sufficiently pled a concrete plan to violate the law. See Oklevueha I, 676 F.3d at 835–36 ("The district court concluded [] Plaintiffs failed to sufficiently allege a 'concrete plan' to violate the CSA because the complaint does not state exactly how, where, and in what quantities Plaintiffs intend to consume marijuana, and does not specify how they intend to cultivate or acquire, store, and distribute marijuana[, however] [w]e disagree that the complaint must contain these factual allegations."). As summarized above, Celestial Heart alleges it intends to continue importing, possessing, and using its sacrament, for without its sacrament, the Church cannot provide essential services, and Plaintiffs Karrel, Osborne, Pozas, and Mintzer, allege that despite the substantial burden of the threat of legal sanctions, they continue to use the sacrament within ceremonies (Compl. ¶¶ 12, 17, 23, 28, 32). See Oklevueha I, 676 F.3d at 836 ("According to Plaintiffs, they have used

marijuana in violation of the CSA countless times, and plan to continue to do so [and] [w]e have explained that the 'concrete plan' element of the genuine threat inquiry is satisfied where plaintiffs had 'more than a concrete plan' to violate the laws at issue because they 'actually did violate them on a number of occasions.' " (quoting <u>Sacks v. Office of Foreign Assets Control</u>, 466 F.3d 764, 773 (9th Cir. 2006))); <u>see also</u> <u>Arizona Yage Assembly v. Garland</u>, No. CV-20-02373-PHX-ROS, 2023 WL 3246927, at *3 (D. Ariz. May 4, 2023) ("<u>AYA v. Garland II</u>") ("While the Court previously dismissed Plaintiffs' RFRA claims because of a failure to allege a concrete plan, the Fifth Amended Complaint specifically alleges AYA 'currently holds bi-monthly Ayahuasca ceremonies' and that it 'plans to continue to hold bi-monthly meetings ... for the foreseeable future[,]' . . . sufficient, taken as true, to allege a concrete plan to violate the CSA.").

### b. Specific Warning and History of Enforcement or Prosecution

#### i. Primary Arguments

First, Defendants argue the complaint is devoid of any allegation Defendants "have communicated a specific warning or threat to initiate proceedings" against Plaintiffs; and that there is not a single allegation Defendants have even communicated with Plaintiffs, let alone threatened to initiate proceedings, whether orally or in writing.[3] Defendants proffer that the lack of communication here stands in stark contrast to two other cases, where similar plaintiffs have alleged that: (i) DHS issued a written notice of seizure and advised plaintiffs that they would "be receiving correspondence from [DHS'] Fines, Penalties, and Forfeitures Branch," <u>Church of the Eagle & the Condor v. Garland</u> ("<u>Condor</u>"), No. 2:22-cv-1004-SRB (D. Ariz. June 9, 2022),

---

[3] Defendants state that Plaintiffs allege in passing that the CBP, an agency within DHS not specifically named as a defendant here, "has made clear threats of prosecution and warning that future shipments will be seized and destroyed." (Compl. ¶ 97.) Defendants argue that Plaintiffs do not supply any facts to support this conclusory allegation, such as when or where CBP made these alleged threats and warnings, what form they took, and which CBP officers were involved in making them. Whether or not this particular allegation is vague or not directly made as to a named Defendant, in addition to other allegations being sufficient on their own for reasons explained herein, the Court notes another court has rejected a similar argument concerning a deficiency as to the precise agency that instituted certain action. <u>See</u> <u>AYA v. Garland II</u>, 2023 WL 3246927, at *3 ("[T]he CSA operates through multiple agencies; as the Agency Defendants have argued, the DEA may grant permits for importation of controlled substances, without which the CBP and/or DHS will seize packages as a matter of course [and] [t]he Agency Defendants' actions and responsibilities are thus intertwined; the Defendant agencies cannot avoid accountability for enforcing the CSA by claiming they enforce only one piece of it."). The Court notes CBP <u>was</u> named as a defendant in AYA. <u>Id.</u> at *1.

Complaint ¶ 50, ECF No. 1; and (ii) a DHS agent "falsely threatened an [alleged church] member with felony drug prosecution to intimidate her into acting as an informant against other [alleged church] members," <u>Arizona Yage Assembly v. Garland</u>, No. 2:22-cv-2373-ROS (D. Ariz. May 15, 2022), Complaint ¶ 62, ECF. No. 159.  While Defendants maintain the allegations in these two cases fail to confer standing (and disputed, via signed declaration from the DHS agent, the veracity of the allegations in No. 2:22-cv-2373-ROS), they argue the allegations here do not even come close to crossing the bar, as Plaintiffs' failure to allege *any* communications made by Defendants to Plaintiffs forecloses any finding of pre-enforcement standing.  (Mot. 13.)

Second, Defendants argue Plaintiffs point to no past federal prosecutions for ayahuasca use, further undermining their claims that they face a genuine threat of imminent prosecution. <u>See</u> <u>Thomas</u>, 220 F.3d at 1140.  Defendants emphasize the lack of federal prosecution is telling, given that Plaintiffs allege religious adherents have been consuming ayahuasca in the United States for the last fifty years (Compl. ¶ 70).  (Mot. 13.)

Third, Defendants argue Plaintiffs' allegations of standing ultimately fall short because the relief they seek is predicated on a single allegation of *past* harm—namely, the alleged 2021 seizure and subsequent arrest of Osborne by state actors.  <u>See</u> <u>Nelsen v. King Cnty.</u>, 895 F.2d 1248, 1251 (9th Cir. 1990) ("[T]he Supreme Court has concluded that past exposure to harm is largely irrelevant when analyzing claims of standing for injunctive relief that are predicated upon threats of future harm." (citing <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495 (1974))); <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 102, 108 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy." (quoting <u>O'Shea</u>, 414 U.S. at 495-96)).  Defendants thus argue that as Plaintiffs have only alleged past harm, (Compl. ¶¶ 37–38), that should end the inquiry.  (Mot. 13-14.)

Plaintiffs respond that: the interdiction, destruction, and continued prohibition of the sacrament as well as the federally assisted arrest of Ms. Osborne are concrete, particularized, actual (not conjectural or hypothetical), injuries sufficient for standing under Article III; that they have suffered an injury-in-fact, both financially and spiritually, resulting from the loss of their sacrament and because of Defendants' continued denial of Plaintiffs' right to obtain, possess, and

1   use it; and without their sacrament, Plaintiffs cannot practice their religion and Celestial Heart

2   cannot perform essential services.  (Opp'n 12.)

3       ii.   The Court Finds Plaintiffs have Established Standing Under the Thomas Factors
            and Related Ninth Circuit Precedent

4

5       First, as to one of the foundational cases cited by Defendants as to general principles of

6   standing flowing from past harm, the portion of O'Shea quoted does not end where excerpted by

7   Defendants ("[p]ast exposure to illegal conduct does not in itself show a present case or

8   controversy . . ."), but continues with the following qualifier: ". . . if unaccompanied by any

9   continuing, present adverse effects."  Lyons, 461 U.S. at 102 (quoting O'Shea, 414 U.S. at 495-

10  96).  Overall, as explained herein, the Court finds continuing present adverse effects alleged, and

11  as discussed below, Plaintiffs allegations fit under the specific caselaw adjudicating similar

12  RFRA challenges in the Ninth Circuit.

13      In the cited portion of Thomas, the Ninth Circuit found the "threat of enforcement based

14  on a future violation—which may never occur—[was] *beyond* speculation," as not only was no

15  action ever brought against the landlords to enforce the marital status provision there, and "no

16  specific threat or even hint of future enforcement or prosecution," the Ninth Circuit further

17  observed "[n]or could there be," "as neither Thomas nor Baker can identify any tenants turned

18  away due to their marital status and no prospective tenant has ever complained to the state or

19  municipal authorities, formally or informally."  Thomas, 220 F.3d at 1140.  The Court finds

20  Plaintiffs' allegations first distinguishable from those in Thomas because there *was* a federal

21  seizure here that already occurred, as well as plausible allegations of future threats or

22  enforcement, as discussed below.  Such seizure and allegations are not beyond speculation here.

23      While Defendants argue standing principles that are generally supportive of their

24  position, the significance of their above cited caselaw is lessened by the more specific and

25  pointed Ninth Circuit law.  Plaintiffs rightfully direct the Court to, and rely on Oklevueha I, and

26  the Court turns to summarize the case before turning to its application here.  As discussed below,

27  Defendants recognize the importance of the case, and as highlighted in Plaintiffs' opposition,

28  Defendants' first and primary attempt to distinguish the case from the facts here falls flat.

Underlying <u>Oklevueha I</u>, in June 2009, federal law enforcement officers in Hawaii seized from FedEx one pound of marijuana that was addressed to a plaintiff and intended for the Oklevueha church use; the marijuana was turned over to the Honolulu Police Department and later destroyed; and the plaintiffs did "not allege that Mooney or any Oklevueha member ha[d] been prosecuted or threatened with prosecution in connection with the seizure or in relation to any other procurement or use of marijuana." <u>Oklevueha I</u>, 676 F.3d at 834.   The <u>Oklevueha</u> plaintiffs sought declaratory and injunctive relief barring the Government from enforcing the CSA against them and for return or compensation for the marijuana taken.  <u>Id.</u> at 833.   The plaintiffs alleged they consumed marijuana as a "sacrament/eucharist" in their religious ceremonies, and that such use was protected by the First Amendment and RFRA.  <u>Id.</u>  "Despite the nonexistence of any criminal charges, [the <u>Oklevueha</u> plaintiffs] claim[ed] . . . fear for their ability to continue to cultivate, consume, possess, and distribute marijuana for religious purposes without being branded criminals and made to face fines and imprisonment," and "[i]n support of this fear, [] point[ed] to a DEA raid in March 2010 on another Hawaii-based church that purports to use marijuana as a religious sacrament."  <u>Id.</u> at 834.

The district court first dismissed the claims for declaratory and injunctive relief related to future use of marijuana ("preenforcement claims") on ripeness grounds, but not the claim for return of, or compensation for, the seized marijuana under RFRA.  <u>Id.</u>[4]   The district court concluded the preenforcement claims did not satisfy the constitutional ripeness test for preenforcement challenges and that even if they did, prudential considerations also warranted dismissal.  <u>Id.</u>   The district court further held that Oklevueha lacked associational standing to assert the claims for prospective relief.  <u>Id.</u>

On appeal, the Ninth Circuit found in favor of plaintiffs as to the ripeness of the preenforcement claims, and as to associational standing.  While the Ninth Circuit couched the analysis under ripeness rather than standing more generally, the Ninth Circuit directly analyzed

---

[4]  The plaintiffs' claims for theft and conversion of the marijuana were also dismissed as barred by sovereign immunity, and in a subsequent order, the district court dismissed Plaintiffs' remaining claims related to the seizure of the marijuana.  676 F.3d at 834.

and employed the <u>Thomas</u> genuine threat analysis that Defendants rely on here, in determining whether the case was ripe as an Article III case and controversy.  See <u>Oklevueha I</u>, 676 F.3d at 835 ("Ripeness is one component of the Article III case or controversy requirement . . . "[t]o bring such a 'preenforcement claim,' we require plaintiffs to allege a 'genuine threat of imminent prosecution.' " (quoting <u>Thomas</u>, 220 F.3d at 1139)).

Significant to the analysis here, the Ninth Circuit noted the <u>Thomas</u> "genuine threat" analysis "presumes that no enforcement has previously occurred, and therefore ascertains the likelihood of future enforcement."  676 F.3d at 835.  Here, like in <u>Olevueha I</u>, "[i]n contrast, the [] seizure was an enforcement of the CSA against Plaintiffs, mitigating the relevance of a hypothetical future-enforcement."  <u>Id.</u>  The Ninth Circuit stated that "[n]onetheless, because Plaintiffs' claims are asserted for the first time in an action for prospective relief (and not in a criminal proceeding)," the Court will "consider the familiar 'preenforcement claim' ripeness analysis, while acknowledging its strained applicability to the unusual allegations before us." <u>Id.</u>; <u>see also</u> <u>Arizona Yage Assembly v. Garland</u>, 595 F. Supp. 3d 869, 882 n.11 (D. Ariz. 2022) ("<u>AYA v. Garland I</u>") ("Although Federal Defendants have seized Plaintiffs' ayahuasca in the past, the Court characterizes the injunction Plaintiffs seek as a pre-enforcement injunction because the <u>Oklevueha I</u> court did so in a factually analogous situation." (citing <u>Oklevueha I</u>, 676 F.3d at 835)).

In <u>Oklevueha</u>, the district court found plaintiffs had not adequately alleged a specific threat of prosecution because the complaint lacked allegations of any threat or warning from federal authorities, or that Plaintiffs intended to continue to bring in marijuana in a way likely to be noticed by federal drug authorities.  <u>Oklevueha I</u>, 676 F.3d at 836.  While this was a factually correct finding,[5] the Ninth Circuit "concluded, however, that the district court's focus on future

---

[5]  Although a different sacrament and controlled substance, the Court finds many facts relevant to the three factor analysis, are similar to those presented here.  See <u>Oklevueha I</u>, 676 F.3d at 836 ("The district court is correct that Plaintiffs do not allege any threat of prosecution related to Plaintiffs' marijuana consumption.  Plaintiffs have never been arrested in connection with their marijuana consumption, nor has there been another seizure of their drugs in the more than two and a half years that have elapsed since the 2009 FedEx seizure.  Moreover, the Government's lawyer clarified at oral argument that the seizure at issue was in a response to a call from FedEx regarding Plaintiffs' package, and was not the result of any active Government investigation.  The Government's lawyer further explained that to his knowledge, neither Mooney nor Oklevueha is the target of any current investigation."); <u>see also</u> <u>id.</u> at 837 n.2 ("We are also cognizant of the possibility that further seizures from a private shipping service could

1  prosecution [was] inapposite."  Id.  Rather, the Ninth Circuit stated the plaintiffs did not need to

2  allege a threat of future prosecution because the statute had already been enforced against them,

3  and when the seizure occurred "pursuant to the CSA, a definite and concrete dispute regarding

4  the lawfulness of that seizure came into existence."  Id. (citing Ry. Mail Ass'n v. Corsi, 326 U.S.

5  88, 93 (1945)).

6      The Ninth Circuit recognized the unique nature of the case in relation to the genuine

7  threat analysis, "in that unlike most enforcements of criminal statutes, the seizure did not result

8  in a criminal proceeding that could have afforded Plaintiffs the opportunity to assert their

9  constitutional and statutory challenges to the enforcement of the CSA against them."  Oklevueha

10  I, 676 F.3d at 836.  Therefore, it did not "follow that because this enforcement and seizure of

11  property did not provide Plaintiffs a process in which to raise their claims, those claims are not

12  now ripe."  Id.  While a threat of prosecution is required "to ensure that the plaintiff challenging

13  a statute can 'demonstrate a realistic danger of sustaining a direct injury as a result of the

14  statute's operation or enforcement[,]' " the injury had "already occurred, thereby eliminating any

15  concerns that [p]laintiffs' fear of enforcement is purely speculative."  Id. at 836–37 (quoting

16  Babbitt, 442 U.S. at 298).

17      As for the past history of prosecution and enforcement under the statute, the Court again

18  finds the circumstances similar to those in Oklevueha.  676 F.3d at 837 ("For the same reason

19  Plaintiffs need not demonstrate a threat of future prosecution under these facts, we conclude that

20  Plaintiffs need not establish the third prong of the "genuine threat of prosecution" inquiry, the

21  history of enforcement of the statute.").  As the Court noted above, Defendants take issue with

22  Plaintiff's aversion to other enforcement actions as conclusory and lacking in details as to make

23  the allegation plausible.  (See Mot. 13 n.6; Compl. ¶ 97.)    However, "we need not rely on

24  enforcement of the statute against other groups in determining whether Plaintiffs are likely to

25  suffer a similar fate in the future, because the CSA has already been enforced against Plaintiffs

26  occur at any time, without ever resulting in a criminal prosecution.  The Government maintains it is not investigating
   Plaintiffs, but a shipping company could again alert the Government of what it deems to be a suspicious package,
27  and the Government might again dispose of its contents.  We do not think Plaintiffs should be forced to accept the
   possibility of continued seizure of marijuana to which they believe they are constitutionally entitled because they
28  cannot show a threat of criminal prosecution.").

through the seizure." Oklevueha I, 676 F.3d at 837.  Here, the CSA was already enforced against Plaintiffs through the seizure of the ayahuasca.  Accordingly, the Court concludes that "[a] non-speculative case and controversy exists regarding Plaintiffs' entitlement to possess and consume [ayahuasca] for religious reasons."  Oklevueha I, 676 F.3d at 837.

Perhaps recognizing the importance of the Ninth Circuit's decision in Oklevueha I, to Plaintiffs' then forthcoming arguments regarding standing, Defendants do not address the case at great lengths in their initial motion.  In their first passing mention of the case, Defendants argue the alleged 2021 seizure cannot support Plaintiffs' claims of future harm by Defendants against Celestial Heart under Oklevueha I, because the seizure occurred before Celestial Heart existed as a legal entity.  (Mot. 14.)  In support of this contention, Defendants provide a declaration and document from the California Secretary of State, that show the Church of the Celestial Heart first filed for incorporation in September 2021—one month after the alleged August 2021 seizure, and request the Court take judicial notice of such fact.  (See Decl. Sarah M. Suwanda ("Suwanda Decl."), ECF No. 12-3 at 1-3.)[6]

However, it appears Defendants' first and primary attempt to distinguish Oklevueha has been quickly refuted by Plaintiffs.   Specifically, Plaintiffs respond Defendants' proffer is factually and legally incorrect, as Celestial Heart became a legal entity in February of 2015 when it formed a nonprofit unincorporated association pursuant to Cal. Corp. Code § 18000 et seq., and thus pursuant to the California's Nonprofit Corporation Law §§ 5121, 7121, and 9121, the existing unincorporated association changed its status to that of a corporation, and retained all rights it had as an unincorporated association as well as gaining all rights as an incorporated association.   (See Opp'n 15; Decl. Kai Karrel Supp. Opp'n ¶ 2, ECF No. 16-2.)

Defendants do not mention this argument in reply.   The Court finds Plaintiffs have adequately addressed this proffer by Defendants, Defendants have left the response unaddressed, and therefore the Court finds Plaintiffs have refuted Defendants' contention that Oklevueha I is inapplicable or distinguishable due to Celestial Heart's date of incorporation.  See Cal. Corp.

---

[6]  The Court takes judicial notice of this fact, which is undisputed by Plaintiffs, but legally not determinative to the issues in this case.  Fed. R. Evid. 201(b), (c)(2).

Code § 5121(a) ("In the case of an existing unincorporated association, the association may change its status to that of a corporation upon a proper authorization for such by the association in accordance with its rules and procedures."); Cal. Corp. Code § 5121(d) ("Upon the change of status of an unincorporated association to a corporation pursuant to subdivision (a), the property of the association becomes the property of the corporation and the members of the association who had any voting rights of the type referred to in Section 5056 become members of the corporation."); Cal. Corp. Code § 5121(f) ("Any action or proceeding pending by or against the unincorporated association may be prosecuted to judgment, which shall bind the corporation, or the corporation may be proceeded against or substituted in its place.").[7]

While Defendants made no attempt to address the date of incorporation in reply, Defendants do make a greater attempt to address and distinguish the impact of Oklevueha I on the standing analysis generally, in their reply.   (See Reply 8.)   Defendants argue it is distinguishable in that Oklevueha I involved both cultivation and shipment of domestic cannabis, rather than international shipment of ayahuasca.   See Oklevueha Native Am. Church of Haw., Inc. v. Holder, 719 F. Supp. 2d 1217, 1219 (D. Haw. 2010).   Defendants also emphasize Plaintiffs do not allege that DEA—the enforcement agency in Oklevueha—took any action with

---

[7]  Having refuted the initial argument regarding the date of incorporation, a leg has essentially been taken out from Defendants' next argument that is largely dependent on such.   (See Mot. 14.)   Specifically, after attempting to use the date of incorporation as foreclosing any past harm, Defendants next argue that Osborne's alleged arrest was made pursuant to a warrant by *state* law enforcement for violating *state* laws—not by any enforcement action taken by Defendants, (Compl. ¶ 38), and that only leaves Plaintiffs with a conclusory statement about an alleged collaboration between DHS and state law enforcement agencies "to threaten criminal prosecution against Plaintiff Osborne" to support Plaintiffs' claim of federal prosecution.   (Mot. 14; Compl. ¶ 39.)   As for that remaining allegation isolated by Defendants, Defendants provide a declaration of Homeland Security Investigations Special Agent James Johnson, which Defendants purport makes clear that federal officials: (1) had no involvement with Osborne's arrest, other than notifying local law enforcement of the intercepted package; (2) did not open an investigation relating to the package or the consignee, much less prosecute any Plaintiff; and (3) did not destroy the package destined for Osborne.   (Decl. of Special Agent James Johnson ("Johnson Decl.") ¶¶ 4-8, ECF No. 12-4.) Similarly, Defendants argue that like the AYA court stated (before transfer from the Northern District to Arizona), here, Special Agent Johnson's "passing along a routine tip" to local law enforcement about an intercepted package cannot establish "any realistic, imminent threat of prosecution or enforcement action by the federal government." Ariz. Yage Assembly v. Barr, No. 3:20-cv-03098-WHO, 2020 WL 5629833, at **3, 14 (N.D. Cal. Sept. 21, 2020) ("AYA v. Barr I").   However, the date of incorporation argument has been refuted and thus these arguments by Defendants cannot be taken as isolated remaining allegations of federal involvement, and the Court finds Oklevueha I applicable to the facts at hand here, for the reasons discussed herein, and related case law.   While Defendants attempt to distinguish, the Court cannot escape the holding and underlying impact of the case in relation to the factual similarity to this case, for the reasons discussed herein.   The Court also discusses the AYA I court's statement concerning the passing of a routine tip, in greater detail below.

1    respect to the seized package or Plaintiffs more generally; nor do they dispute that the allegedly

2    seized package was not sent by Celestial Heart; and overall, argue the "alleged seizure by DHS

3    of a package not sent by Celestial Heart cannot form the basis for a broad pre-enforcement

4    injunction against DEA and the CSA *in toto* when DEA has taken no action against Plaintiffs."

5    (Reply 8.)

6            First, the Court does not find the domestic/international distinction to be determinative

7    here, and Defendants have provided no authority or further rationale as to why it should be.  The

8    Court acknowledges that, for example, an analysis of the Fourth Amendment is impacted when

9    an international border is involved.  See United States v. Seljan, 547 F.3d 993, 999 (9th Cir.

10   2008) (" 'The border search doctrine is a narrow exception to the Fourth Amendment prohibition

11   against warrantless searches without probable cause[,]' [and]  . . . [s]uch border searches are

12   grounded in the government's right to protect the nation's territorial integrity by examining

13   persons and property entering and leaving the country." (quoting United States v. Sutter, 340

14   F.3d 1022, 1025 (9th Cir. 2003))).  The Government may have more support for a compelling

15   interest argument or other analysis or balancing test, given the international shipment aspect,

16   however, for purposes of standing and ripeness, taking the principles and analysis of Oklevueha

17   I, the Court is not convinced that the international aspect, nor the aspect that Celestial Heart was

18   the recipient and not the shipper, to be determinative or meaningfully distinctive when faces with

19   the otherwise overwhelming analogous facts and applicable law in Oklevueha I.

20           As for the Defendants' argument regarding a lack of action by DEA in relation to DHS's

21   seizure, again, the AYA v. Garland II court was presented with a similar argument, and the Court

22   finds that court's reasoning can be properly applied here in large part.  There, the defendants

23   argued there was no past enforcement of the CSA, proffering "CBP's alleged border seizures

24   cannot form the basis for a broad pre-enforcement injunction against DEA and the CSA *in toto*

25   because DEA has not enforced these provisions against Plaintiffs."  AYA v. Garland II, 2023

26   WL 3246927, at *3.  The court rejected the argument, noting "the CSA operates through multiple

27   agencies; as the Agency Defendants have argued, the DEA may grant permits for importation of

28   controlled substances, without which the CBP and/or DHS will seize packages as a matter of

1  course . . . [thus] [t]he Agency Defendants' actions and responsibilities are [] intertwined; [and]

2  the Defendant agencies cannot avoid accountability for enforcing the CSA by claiming they

3  enforce only one piece of it."  Id.

4      Based on the allegations summarized above as applied to the most relevant caselaw in the

5  Ninth Circuit, the Court finds Plaintiffs have sufficiently alleged a genuine threat of imminent

6  prosecution, Thomas, 220 F.3d at 1139, and this supports the conclusion that Plaintiffs have

7  demonstrated standing.  "[J]ust because DEA has not commenced a federal criminal prosecution

8  does not mean the CSA has not been enforced against Plaintiffs [and] as in Oklevueha I, '[w]hen

9  the government seized Plaintiffs' [drugs] pursuant to the CSA, a definite and concrete dispute

10  regarding the lawfulness of that seizure came into existence.' "  AYA v. Garland II, 2023 WL

11  3246927, at *3 (quoting Oklevueha I, 676 F.3d at 836).  Accordingly, "[a] non-speculative case

12  and controversy exists regarding Plaintiffs' entitlement to possess and consume [ayahuasca] for

13  religious reasons."  676 F.3d at 837.

14      The Court now turns to Defendants' remaining arguments pertaining to standing,

15  including arguments regarding redressability, and failure to utilize the DEA exemption

16  procedure.

17      3.   The Court Rejects Defendants' Traceability Arguments, and Denies Request to
         Decline Judicial Review for Lack of Seeking DEA Exemption
18

19      Defendants argue the single DHS seizure is insufficient to establish standing because

20  Plaintiffs fail to show their alleged injury is fairly traceable to the challenged action of

21  Defendants.  See Lujan, 504 U.S. at 560 ("[T]here must be a causal connection between the

22  injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged

23  action of the defendant, and not ... th[e] result [of] the independent action of some third party not

24  before the court.' " (quoting Simon, 426 U.S. at 41–42)).  Defendants proffer the Ninth Circuit

25  and other courts have held that criminal defendants lack standing to assert a RFRA defense to

26  prosecution where they could have applied for a permit to engage in the otherwise illegal

27  activity, and yet failed to do so.  See United States v. Hugs, 109 F.3d 1375, 1378–79 (9th Cir.

28  1997); United States v. Winddancer, 435 F. Supp. 2d 687, 692 (M.D. Tenn. 2006).

Defendants' cases raise arguments that are instructive, but do not convince the Court to depart from the more pointed and relevant holding in <u>Oklevueha I</u>.[8]   <u>Hugs</u> involved a challenge to the Bald and Gold Eagle Protection Act, 16 U.S.C. § 668 *et seq.* ("BGEPA"), relating to a criminal prosecution under such law.   <u>Hugs</u>, 109 F.3d at 1378 ("We analyze a Free Exercise challenge to a neutrally based statute under [RFRA] which forbids government from 'substantially burdening' the free exercise of religion unless imposition of the burden promotes a compelling government interest and is the least restrictive means of furthering that interest.").

There, the court did "not question that the BGEPA imposed a substantial burden on the practice of such religions by restricting the ability of adherents to obtain and possess eagles and eagle parts," and the "Hugs [did] not deny that protection of bald and golden eagles serves a compelling government interest," but the court found the statute and permit system did provide "the least restrictive means of conserving eagles while permitting access to eagles and eagle parts for religious purposes."   <u>Id.</u> ("[A]pplicant for a permit is required to identify the species and number of eagles, parts, or feathers to be taken or acquired, the applicant's tribe, and the pertinent religious ceremony . . . must attach certifications that the applicant is an Indian and is authorized to participate in the identified ceremony . . . [and] [a] permit is issued on the application if doing so will be compatible with preservation of the bald or golden eagle.").   The Ninth Circuit found such "information is the minimum necessary to assure that eagles and eagle parts will be used for religious purposes," and the "Hugs [did] not argue to the contrary."   <u>Id.</u> Instead, the Hugs "assert[ed] . . . that the permit system is unduly burdensome in practice because up to two years may be required to obtain a permit to take, possess, or transport certain types of eagle parts."   <u>Id.</u>   Most significant to the Court as to the Plaintiffs' complaint here and Defendants' challenge that Plaintiffs should be required to apply for an exemption, in <u>Hugs</u>, the Ninth Circuit held the criminal defendants "never sought to use the permit system and therefore have no standing to challenge the *way in which the scheme operates*."   <u>Id.</u> at 1378–79 (emphasis added).

---

[8]  Plaintiffs did not assist the Court address this line of cases (<u>Hugs</u>, <u>Winddancer</u>), not mentioning them at all in the opposition.  The Court recognizes the cases were not discussed in in <u>Oklevueha I</u>.

Therefore, in addition to the case involving a criminal prosecution, it involved the criminal defendants' challenge to the operation of the established permit system for the religious item.  In <u>Hugs</u>, it was significant that the challenge was to the permit system itself, in relation to the fact they had not attempted to use that permit system.  Here, Plaintiffs are not challenging the DEA's exemption process or how it operates, but are bringing a claim that the seizure of the religious item by the federal government, and the threat of prosecution substantially burden the Plaintiffs.  While the case is persuasive, it ultimately does not counsel the Court to sway from the more pointed holding of <u>Oklevueha I</u>, especially where the Plaintiffs do not specifically challenge the exemption system itself.  The Court acknowledges the Plaintiffs do aver in the complaint that they should not have to endure the exemption process: "This Court can grant similar relief to Plaintiffs without the need for Plaintiffs to endure the DEA's significantly more restrictive exemption process."  (Compl. ¶ 98.)  However, Plaintiffs in the next paragraph expressly state that: "[t]he issue is not whether petitioning the DEA for an exemption from the CSA imposes a substantial burden but whether the confiscation, destruction and prohibition of Plaintiffs' sacrament and the continued threat of these are a substantial burden."  (Compl. ¶ 99.)  In addition to the Plaintiffs' challenge not being directed at the exemption system here, it is of some significance that <u>Hugs</u> involved a delineated permit system that specifically authorized the items in question for religious ceremonies, and thus is not wholly analogous to the general exemption system put in place by the DEA.

The Court finds <u>Winddancer</u>, a non-binding case, distinguishable for similar reasons as <u>Hugs</u>.  <u>See</u> <u>Winddancer</u>, 435 F. Supp. 2d at 692.  In <u>Winddancer</u>, the United States argued the defendant did "not have standing to challenge the regulations implementing the MBTA because, under those regulations, the defendant could have applied for a permit to possess migratory bird parts but did not do so," and argued "courts have not typically allowed defendants to make collateral challenges to regulatory statutes where the defendant inexplicably failed to apply for a permit to perform the activity in question."  <u>Id.</u>  The court in <u>Winddancer</u> relied on <u>Hugs</u>, noting in "similar challenges to federal bird feather regulations, courts have addressed the standing issue consistently with [such] approach."  <u>Winddancer</u>, 435 F. Supp. 2d at 693 (citing <u>Hugs</u>, 109 F.3d

at 1378)).  Winddancer relied on the Ninth Circuit's holing that "failure to apply for a permit precludes challenge to the manner in which the Act is administered," and noted its holding that Hugs "could challenge only the 'facial validity of the BGEPA and its regulations' and not 'the operation of the underlying administrative scheme.' "  Winddancer, 435 F. Supp. 2d at 692 (quoting Hugs, 109 F.3d at 1378); see also Hugs, 109 F.3d at 1378 ("We agree with the decisions of several district courts in this circuit that failure to apply for a permit precludes challenge to the *manner in which the Act is administered*.") (emphasis added); United States v. Lundquist, 932 F. Supp. 1237, 1242 n.4 (D. Or. 1996) ("Lundquist has no standing to challenge the *alleged imperfections of the permit process* because he has never applied for a permit.") (emphasis added); United States v. Thirty Eight (38) Golden Eagles or Eagle Parts, 649 F. Supp. 269, 274 (D. Nev. 1986) ("[C]laimant has standing to challenge only the *facial* validity of the Eagle Protection Act, and not the manner in which the Act is administered. In order to challenge the administration of the Act, claimant would have first had to apply for a permit, which he has failed to do.") (emphasis in original), aff'd, 829 F.2d 41 (9th Cir. 1987).

The Court therefore finds Hugs, Winddancer, and other cases involving challenges to the operation of the permit systems there, distinguishable to the complaint here, and the more direct holding in Oklevueha I.

As noted above, while the statute is not mentioned elsewhere or cited as a basis for a separate cause of action in the body of the Plaintiffs' complaint, the caption of Plaintiffs' complaint indicates Plaintiffs generally seek review of agency action pursuant to 5 U.S.C. § 702. (Compl. at 1.)  Section 702 is not mentioned in the motion to dismiss.  While not discussed by either party, the Court notes that the court in AYA (after transfer to Arizona), denied the plaintiffs' Section 702 claim for lack of standing.  See AYA v. Garland I, 595 F. Supp. 3d at 880–81 ("Court need not determine whether there has been 'final agency action' sufficient to permit judicial review pursuant to 5 U.S.C. § 704 because Plaintiffs lack standing to assert a claim under the APA . . . Plaintiffs claim the DEA's alleged policy of denying exemptions to visionary churches resulted in agency action that is reviewable under § 702 [however] Plaintiffs are incorrect [as they] have not suffered any legal wrong because they have not participated in

the exemption process [and] [t]o raise a claim under the APA, Plaintiffs are required to petition for an exemption or a new rulemaking . . . [and] if the DEA denied the petition or refused to respond to it, Plaintiffs could argue they were harmed because the DEA failed to comply with the APA.") (citations omitted).  The court dismissed the APA claim without leave to amend.

Of note, the Arizona court also initially granted dismissal of the prospective relief claims for lack of standing.  AYA v. Garland I, 595 F. Supp. 3d at 882 (finding under Oklevueha I and Thomas factors that plaintiffs had not alleged a genuine threat of enforcement).  However, as noted above, the Arizona court later ruled in favor of the plaintiffs as to standing.  AYA v. Garland II, 2023 WL 3246927, at *4 ("While the Court previously dismissed Plaintiffs' RFRA claims because of a failure to allege a concrete plan, the Fifth Amended Complaint specifically alleges AYA 'currently holds bi-monthly Ayahuasca ceremonies' and that it 'plans to continue to hold bi-monthly meetings ... for the foreseeable future.' ").[9]

Given no clear direct challenge to the exemption process by Plaintiffs within the complaint, and given the Defendants do not clearly challenge a specific aspect of the APA claim versus their general standing challenges, the Court does not further consider the permit exhaustion argument as applied specifically to the lone citation to Section 702 in the caption of the complaint.  In other words, no APA claim is brought as a separate clear cause of action let alone for the exemption permit process itself, and Defendants do not mount a specific challenge to any such claim, to the extent it can be construed as separate cause of action, in their motion to dismiss.

Turning to traceability generally, Defendants argue that while Plaintiffs allege the Defendants' destruction of the sacrament, Defendants dispute they have destroyed the allegedly seized ayahuasca.  Rather, Defendants transferred the package (sent by Mystical Nature, not Celestial Heart), to local law enforcement and played no role in how local law enforcement subsequently handled the package.  Defendants contend this vitiates any argument that Plaintiffs'

_____

[9]  While discussed in relation to Defendants' challenges at various points herein, it is overall worthy to note that collectively, the court in AYA v. Garland II rejected the defendants' arguments concerning the lack of direct action by DEA versus CBP; rejected the request to stay the case for plaintiffs to seek an exemption; found plaintiffs established general and associational standing; and rejected the defendants' 12(b)(6) arguments.  AYA v. Garland II, 2023 WL 3246927, at *3-5.

alleged injury is fairly traceable to Defendants' actions.  (See Johnson Decl. ¶ 5.)  Whether or not that particular injury of destruction of the sacrament is traceable to Defendants, the Court finds other injuries stemming from the seizure and threat of future enforcement are fairly traceable to the Defendants, taking the allegations in the complaint in the light most favorable to the Plaintiffs, and as other courts have found sufficient, discussed herein.

> **a.    Request to Decline Review**

Still in the standing context, Defendants submit that in the alternative, as a matter of judicial economy and sensible governance, the Court should decline to review Plaintiffs' claim until after they have sought an exemption from DEA, as this would allow the DEA the opportunity to evaluate in the first instance whether Plaintiffs are eligible for a religious exemption.  Similar arguments are made by Defendants in multiple points of their motion to dismiss.  The Court declines such request, for reasons explained above, and below in this section and in later sections, where Defendants touch on similar but not identical arguments.  The Court finds the holding in Oklevueha I is most instructive to Defendants' various forms of requests to dismiss or stay regarding the exemption process.

In Oklevueha I, the government argued the request for prospective relief was unripe because Plaintiffs did not request an exception to the CSA from the DEA.  Oklevueha I, 676 F.3d at 838 ("Government argues that we should require Plaintiffs to exhaust this administrative remedy, because doing so would allow the DEA to apply its expertise to Plaintiffs' claim, possibly moot the case if the claim is granted, and help build a record for judicial review.").  The Ninth Circuit declined "to read an exhaustion requirement into RFRA where the statute contains no such condition, . . . and the Supreme Court has not imposed one."  Oklevueha I, 676 F.3d at 838 ("Indeed, the Supreme Court has reviewed a RFRA-based challenge to the CSA without requiring that the plaintiffs first seek a religious use exemption from the DEA." (citing O Centro, 546 U.S. at 418)).  The Ninth Circuit noted the Supreme Court "recognized that RFRA 'plainly contemplates that *courts* would recognize exceptions [to the CSA]—that is how the law works.' "  Oklevueha I, 676 F.3d at 838 (quoting O Centro, 546 U.S. at 434 (emphasis and alteration in original)).  Rather than imposing an exhaustion requirement, the Ninth Circuit concluded the

1   issue at hand was "not an abstract disagreement but rather involve[d] the application of well-

2   developed law (including the First Amendment right to religious freedom, RFRA and the CSA)

3   to an existing case and controversy (the seizure of Plaintiffs' marijuana)," and thus the claims

4   were "fit for review."  Oklevueha I, 676 F.3d at 838.

5          More recently, the AYA v. Garland II court considered a similar argument, and also

6   relied on the holding in Oklevueha I.  2023 WL 3246927, at *4 ("[B]ulk of Defendants'

7   arguments stem from the fact that Plaintiffs have not sought an exemption from the applicability

8   of the CSA.").  As that court acknowledged and considered, the "DEA promulgated the

9   'Guidance' in 2009 in response to the Supreme Court's ruling in" O Centro.  Id. (citing O

10  Centro, 546 U.S. 418).  The court relied on the fact that the Ninth Circuit, after O Centro,

11  considered similar arguments in Oklevueha I, and the AYA IV court concluded it would "not

12  depart from that clear precedent," and denied the defendants' alternative request to stay the case

13  to allow the plaintiffs to apply for an exemption.  2023 WL 3246927, at *4 ("[T]he Ninth Circuit

14  addressed a similar argument . . . and the court refused 'to read an exhaustion requirement' . . .

15  [thus] [b]oth the Supreme Court and the Ninth Circuit have recognized that RFRA 'plainly

16  contemplates that *courts* would recognize exceptions [to the CSA]—that is how the law works.'

17  " (citations omitted) (emphasis in original)); see also Condor, No.CV-22-01004-PHX, ECF 26 at

18  6 n.4, (D. Ariz. 2022) ("The Court declines Defendants' request for the Court to dismiss or stay

19  the case until Plaintiffs apply directly to the DEA for an exemption . . . RFRA 'plainly

20  contemplates' that this Court may consider Plaintiffs' requested relief from the CSA." (quoting

21  Oklevueha I, 676 F.3d at 838)).  The Northern District of California, prior to transferring the case

22  to Arizona, also discussed a similar argument.  See AYA v. Barr I, 2020 WL 5629833, at *8

23  ("[I]t is far from clear that the new regulations would affect, let alone moot, the plaintiffs' claims

24  [as the Ninth Circuit has declined to read an exhaustion requirement into RFRA] . . . "after the

25  2009 Guidance was in effect . . . [and thus] it is possible that regardless of any new regulations,

26  the plaintiffs will not have to seek an exemption from the DEA prior to seeking judicial redress."

27  (citing Oklevueha I, 676 F.3d at 838)).

28          Accordingly, the Court declines Defendants' request to decline to review Plaintiffs' claim

1   until after they have sought an exemption from DEA.  Oklevueha I, 676 F.3d at 838; Condor,

2   No.CV-22-01004-PHX, ECF 26 at 6 n.4; AYA IV, 2023 WL 3246927, at *4.

3        4.    The Court Finds No Prudential Ripeness Concerns

4        "The question of prudential ripeness requires us to first consider the fitness of the issues

5   for judicial review, followed by the hardship to the parties of withholding court consideration."

6   Oklevueha I, 676 F.3d at 837.  Defendants do not raise or mention any prudential ripeness

7   challenge in their moving papers, and the Court finds no such prudential reasons apparent that

8   would counsel against exercising jurisdiction.  Id. ("Courts have regularly declined on prudential

9   grounds to review challenges to recently promulgated laws or regulations in favor of awaiting an

10  actual application of the new rule . . . [i]n contrast to cases in which the courts are left to

11  hypothesize about how the law might be applied, Plaintiffs' claims arise from an enforcement

12  action that has already occurred [as] [t]he seizure . . . presents a 'concrete factual scenario that

13  demonstrates how the laws, as applied, infringe [Plaintiffs'] constitutional rights.' " (quoting

14  Thomas, 220 F.3d at 1141)); Oklevueha I, 676 F.3d at 838-39 ("As Plaintiffs' claims are fit for

15  review now, we do not reach the second factor of the prudential ripeness inquiry—hardship to

16  the parties in delaying review. Hardship serves as a counterbalance to any interest the judiciary

17  has in delaying consideration of a case . . . Because we can identify no interest in delaying

18  review of Plaintiffs' claims, the hardship that would be imposed by any delay is not relevant.").

19       5.    The Court finds Plaintiffs have Demonstrated Associational Standing

20       "[A]n association has standing to bring suit on behalf of its members when: (a) its

21  members would otherwise have standing to sue in their own right; (b) the interests it seeks to

22  protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

23  relief requested requires the participation of individual members in the lawsuit."  Hunt, 432 U.S.

24  at 343; see also Oklevueha I, 676 F.3d at 839.  Defendants argue Plaintiffs do not satisfy the first

25  or third factor necessary to demonstrate associational standing.  (Mot. 16.)  The Court finds the

26  decision in Oklevueha I also weighs in favor of Plaintiffs as to the associational standing

27  challenge as well.

28       More specifically, Defendants argue the complaint does not sufficiently allege any

1   member faces the requisite "genuine threat of imminent prosecution," Thomas, 220 F.3d at 1139,

2   and thus, Celestial Heart fails to establish that "at least one of [its] members has 'suffered

3   sufficient injury to satisfy the case or controversy requirement of Article III.' " Ass'n of Pub.

4   Agency Customers v. Bonneville Power Admin., 733 F.3d 939, 949 (9th Cir. 2013) (quoting

5   Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004)).  The Court first rejects this

6   argument because the Court already found Plaintiffs did sufficiently allege a genuine threat of

7   imminent prosecution under Oklevueha I.

8       Defendants additionally specifically argue Plaintiffs' RFRA claim "requires the

9   participation of individual members in the lawsuit," Hunt, 432 U.S. at 343, and cannot be

10  brought in a representative capacity.  Defendants emphasize that as both the text of the statute

11  and Supreme Court precedent make clear, RFRA requires the Court to identify the contours of "*a*

12  *person's*" sincere religious belief to determine whether it is substantially burdened and, if so, to

13  decide whether the "application of the burden *to the person*" is justified.  42 U.S.C. § 2000bb-

14  1(a)-(b) (emphases added); see also O Centro, 546 U.S. at 430–31 (RFRA contemplates "an

15  inquiry more focused than [a] categorical approach" because it requires "application of the

16  challenged law 'to the person'—the particular claimant whose sincere exercise of religion is

17  being substantially burdened[.]" (quoting 42 U.S.C. § 2000bb-1(b))).  Defendants argue the

18  complaint does not include an individual attestation from each member indicating that their

19  sincerely held religious beliefs are being substantially burdened by the Government's actions and

20  relies instead on generalized allegations that Celestial Heart's members are "substantially

21  burdened" by federal drug laws.  (See, e.g., Compl. ¶ 93.)

22      In consideration of these arguments, the Court finds Plaintiffs' allegations contained in

23  the complaint are sufficient to satisfy the requirements for associational standing.  The district

24  court in Oklevueha found the organization did not have associational standing to seek injunctive

25  relief because the complaint did not allege details regarding each member's use of marijuana.

26  Oklevueha I, 676 F.3d at 839.  The Ninth Circuit disagreed with that holding for three main

27  reasons.  First, the members would have standing in their own right because the complaint

28  alleged they all use marijuana as a regular and integral part of their religious practice.  Id.

1    Second, the lawsuit sought to protect the "members' use of marijuana in religious ceremonies,

2    the administration of which Plaintiffs allege is the 'sole purpose' of Oklevueha." Id.

3          Here, Celestial Heart alleges it has suffered both financial and spiritual loss having its

4    sacrament confiscated and destroyed; that it is substantially burdened by being forced to choose

5    between following the tenets of its religion or being coerced to act contrary to its religious beliefs

6    by the threat of civil or criminal sanctions; and that it intends to continue importing, possessing,

7    and using its sacrament, for without its sacrament, the Church cannot provide essential services.

8    (Compl. ¶ 12.)   Plaintiffs Karrel, Osborne, Pozas, and Mintzer, allege that ayahuasca is an

9    essential sacrament for each, without which they cannot practice their religion, and given the

10   confiscation and destruction of the Church's sacrament, as well as the arrest of Osborne, allege

11   they are substantially burdened by being forced to choose between following the tenets of their

12   religion or being coerced into acting contrary to their religious beliefs by the threat of civil or

13   criminal sanctions.  (Compl. ¶¶ 17, 23, 28, 32.)  These Plaintiffs similarly allege that despite the

14   substantial burden of the threat of legal sanctions, they continue to use the sacrament within

15   ceremonies.   (Id.)   The Court finds these allegations sufficient, without relying on the

16   declarations attached to the Plaintiffs' opposition.  Oklevueha I, 676 F.3d at 839; AYA v.

17   Garland II, 2023 WL 3246927, at *4 ("Defendants [] argue Plaintiffs have failed to allege any

18   AYA member has suffered an injury sufficient to establish they would have standing to sue in

19   their own right[,] [h]owever, Plaintiffs have alleged ayahuasca is a central component of AYA

20   members' religion . . . and that if ayahuasca shipments continue to be seized, their members will

21   be unable to practice their religion.").

22         Third, in Oklevueha I, the Ninth Circuit found the prospective relief sought did not

23   require individual members to participate in the action, as "[i]f in a proper case the association

24   seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be

25   supposed that the remedy, if granted, will inure to the benefit of those members of the

26   association actually injured." Id. (quoting Warth v. Seldin, 422 U.S. 490, 515 (1975)); Arizona

27   Yage Assembly v. Garland, No. CV-20-02373-PHX-ROS, 2023 WL 3246927, at *4 (D. Ariz.

28   May 4, 2023) ("Defendants also argue that individual members must participate in the litigation,

destroying AYA's associational standing[, however,] . . . <u>Oklevueha</u> answered this question on closely related facts," holding the prospective relief will inure to the benefit of those members of the association actually injured[,]' . . . [and thus there] is no need for the kind of individualized inquiry Defendants suggest.").

For all of the above reasons, the Court finds Celestial Heart's members would otherwise have standing to sue in their own right; the interests Celestial Heart seeks to protect are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  <u>See</u> <u>Hunt</u>, 432 U.S. at 343; <u>Oklevueha I</u>, 676 F.3d at 839.  Therefore, the Court finds Plaintiffs have demonstrated they have associational standing.

6.  <u>The Court Shall Deny Defendants' Motion to Dismiss for Lack of Standing</u>

The Court finds the "seizure of Plaintiffs' [ayahuasca] that has already occurred creates a justiciable case and controversy about Plaintiffs' constitutional and statutory entitlement to use [ayahuasca] for religious purposes." <u>Oklevueha I</u>, 676 F.3d at 839.  "Adjudication of Plaintiffs' claims does not require that the court entangle itself in hypothetical scenarios or 'abstract disagreements.' " <u>Id.</u>  Plaintiffs have also alleged facts sufficient to support redressability, and associational standing.  Accordingly, for the above explained reasons, the Court shall deny the Defendants' Rule 12(b)(1) motion to dismiss for lack of standing.

**D.  The Court finds Plaintiffs have Sufficiently Alleged a *Prima Facie* Case under RFRA and the Court Shall Deny Defendants' Rule 12(b)(6) Motion to Dismiss**

Defendants argue Plaintiffs do not adequately allege that DEA has substantially burdened their alleged religious practices; allege no burden imposed by Defendants with respect to their continued use of ayahuasca, as by Plaintiffs' own account, they continue to import and use ayahuasca with impunity; and nor have they alleged any communication, let alone threat of enforcement, made by Defendants to Plaintiffs.  Defendants contend this means the only possible burden Plaintiffs could point to is DEA's administrative process for considering religious-based exemptions, and the process, which is no more onerous than what civil discovery would require here, does not impose a substantial burden on Plaintiffs, and, indeed, Plaintiffs do not allege that

1   it does.  Thus, Defendants submit that Plaintiffs fail to state a RFRA claim for two distinct

2   reasons: (i) the factual allegations belie any notion Plaintiffs have been "coerced to act contrary

3   to their [alleged] religious beliefs," and (ii) Plaintiffs face no substantial burden where they have

4   failed to allege that DEA's religious-exemption process poses a substantial burden, let alone

5   applied for such exemption.

6         Plaintiffs argue Celestial Heart cannot hold central religious ceremonies in the absence of

7   its Holy Sacrament, and emphasize a government law or regulation that causes a party to forgo a

8   central religious practice imposes a substantial burden on the religion.  See Greene v. Solano

9   Cnty. Jail, 513 F.3d 982, 988 (9th Cir. 2008) ("We have little difficulty in concluding that an

10  outright ban on a particular religious exercise is a substantial burden on that religious exercise.");

11  Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141 (1987).

12         1.    General Legal Standards

13        Again, RFRA provides that the "Government shall not substantially burden a person's

14  exercise of religion even if the burden results from a rule of general applicability, except as

15  provided in subsection (b)."  42 U.S.C. § 2000bb-1(a).  Subsection (b) provides that the

16  "Government may substantially burden a person's exercise of religion only if it demonstrates

17  that application of the burden to the person--**(1)** is in furtherance of a compelling governmental

18  interest; and **(2)** is the least restrictive means of furthering that compelling governmental

19  interest."  42 U.S.C. § 2000bb-1(b).  RFRA provides a "Judicial Review" provision that

20  provides: "A person whose religious exercise has been burdened in violation of this section may

21  assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief

22  against a government."  42 U.S.C. § 2000bb-1(c) ("Standing to assert a claim or defense under

23  this section shall be governed by the general rules of standing under article III of the

24  Constitution.").

25        Thus, courts have generally noted that to state a *prima facie* claim under RFRA, Plaintiffs

26  must show that the "application of the Controlled Substances Act would (1) substantially burden

27  (2) a sincere (3) religious exercise."  O Centro, 546 U.S. at 428  (adopting the standard set forth

28  by the district court); see also AYA v. Garland II, 2023 WL 3246927, at *5; United States v.

1    Lepp, No. CR 04-00317 MHP, 2008 WL 3843283, at *4 (N.D. Cal. Aug. 14, 2008), aff'd, 446 F.

2    App'x 44 (9th Cir. 2011). "Under RFRA, a 'substantial burden' is imposed only when

3    individuals are forced to choose between following the tenets of their religion and receiving a

4    governmental benefit [] or coerced to act contrary to their religious beliefs by the threat of civil

5    or criminal sanctions." Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1069–70 (9th Cir.

6    2008) (citations omitted).

           2.      The Court finds Plaintiffs have Sufficiently Alleged a Substantial Burden

8          The Court recognizes here, as Defendants emphasize, the Plaintiffs allege they have

9    concrete plan to continue violating, as discussed in relation to standing above. Defendants argue

10   that concession forecloses any inference that Plaintiffs are being "coerced to act contrary to

11   [their] religious beliefs." Navajo Nation, 535 F.3d at 1070. Defendants argue that Plaintiffs

12   nowhere allege that Celestial Heart, or any of its members, have been forced to stop practicing

13   their alleged religion. The Court is not going to force a plaintiff in a RFRA challenge case to

14   allege a concrete plan to establish standing, then dismiss the action on the basis that a plaintiff

15   cannot be substantially burdened if they have not actually stopped practicing the sacrament or

16   their religion. AYA v. Garland II, 2023 WL 3246927, at *4 ("While the Court previously

17   dismissed Plaintiffs' RFRA claims because of a failure to allege a concrete plan, the Fifth

18   Amended Complaint specifically alleges AYA 'currently holds bi-monthly Ayahuasca

19   ceremonies' and that it 'plans to continue to hold bi-monthly meetings ... for the foreseeable

20   future.' ").

21         Significantly, in the moving papers, Defendants again reference the date of incorporation

22   as one factor of the argument presented as to the "lone seizure made before Celestial Heart's

23   incorporation," but that element of the argument has seemingly been refuted in opposition, and

24   not again addressed by Defendants in reply, as the Court discussed above in relation to the

25   Defendants' first attempt to distinguish Oklevueha I. The Court finds the Plaintiffs' allegations

26   generally establish a substantial burden for similar reasons discussed above in the standing

27   analysis, and as additionally discussed below. Although the Court recognizes herein Defendants'

28   argument regarding the fact the creation of the DEA exemption process occurred after the

decision in <u>O Centro</u>, setting aside the arguments regarding the exemption process for a moment, of note, there the Government conceded the burden.  <u>O Centro</u>, 546 U.S. at 426 ("Government conceded that the challenged application of the Controlled Substances Act would substantially burden a sincere exercise of religion by the UDV.").  Thus, taking the allegations as true, "[i]t is obvious that prohibiting the use of Daime tea would substantially burden the exercise of plaintiffs' religion." <u>Church of the Holy Light of the Queen v. Mukasey</u>, 615 F. Supp. 2d 1210, 1219 (D. Or. 2009), <u>vacated sub nom.</u> <u>Church of Holy Light of Queen v. Holder</u>, 443 F. App'x 302 (9th Cir. 2011) (to limit scope of injunction).

"To paraphrase the California Supreme Court's observation about the role of peyote in the Native American Church, the ceremonial use of Daime tea is 'the sine qua non of [plaintiffs'] faith [and] [i]t is the sole means by which [plaintiffs] are able to experience their religion; without [Daime tea] [plaintiffs] cannot practice their faith.' " <u>Id.</u> (quoting <u>People v. Woody</u>, 61 Cal.2d 716, 725 (1964)); <u>Navajo Nation</u>, 535 F.3d at 1069–70 ("Substantial burden imposed "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit [] or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions.") (citations omitted); <u>AYA v. Garland II</u>, 2023 WL 3246927, at *5 ("A statute burdens the free exercise of religion if it puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, including when, if enforced, it results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution." (quoting <u>Guam v. Guerrero</u>, 290 F.3d 1210, 1222 (9th Cir. 2002)).

Relatedly, Defendants argue vague and non-particularized allegations of federal-state conspiracies cannot support their claim, where Plaintiff alleges they are "aware" of "several [other] prosecutions that began with seizures of ayahuasca by DHS, which then led to DEA or other agents of the Defendants collaborating with state law enforcement" to "prosecute churches and their members who use ayahuasca in a religious context." (Compl. ¶ 40.)  Defendants argue that aside from listing states where these prosecutions have allegedly occurred, Plaintiffs offer no facts about when these investigations and prosecutions occurred, who, specifically, within the federal government was involved, and what form the alleged collaboration took.  While the

1   Court agrees these allegations are somewhat vague, the other allegations standing alone, or when

2   considered with the plausible aspects of these allegations, is enough, taking the allegations in the

3   light most favorable to the Plaintiffs.  Church of the Holy Light, 615 F. Supp. 2d at 1219; AYA

4   v. Garland II, 2023 WL 3246927, at *5; Navajo Nation, 535 F.3d at 1069–70.

5   Finally, Defendants emphasize the complaint concedes Osborne was arrested by local law

6   enforcement on suspicion of violating various California Health and Safety Codes, and Plaintiffs

7   do not allege Osborne had even been threatened or charged with a federal crime, and instead

8   concede that no federal or state entity has formally charged Osborne.[10]  Thus, Defendants proffer

9   that leaves Plaintiffs with the single factual allegation that Defendants informed local law

10   enforcement about the package addressed to Osborne (Compl. ¶ 39), and direct the Court to

11   AYA v. Barr I, proffering that court held the mere passing of a routine tip by a federal agent

12   cannot establish "any realistic, imminent threat of prosecution or enforcement action by the

13   federal government."  2020 WL 5629833, at *3, 14.  Defendants thus submit Plaintiffs cannot

14   rely on the actions of local law enforcement to support a claim against Defendants where the

15   complaint's factual allegations make clear that local law enforcement acted on their own accord.

16   First, there is not simply a routine tip here, as above, the Defendants' argument to

17   exclude the federal seizure based on date of incorporation has been refuted.  Further, overall

18   consideration of the various decisions by the AYA courts weigh in favor of Plaintiffs here.

19   It is true the AYA v. Barr I court noted such routine tip in the factual summary portion of

20   the opinion.  2020 WL 5629833, at *3 ("The federal defendants represent—and support with

21   sworn declarations—that the only involvement the federal government had in the operation was

22   passing along a routine tip to MCSO about Villanueva's ayahuasca use on January 8, 2020.").  In

23   denying a motion for preliminary injunction, the court noted such fact, among others, as to why

24   the plaintiffs had *likely* not demonstrated they could succeed on the merits, however, rested the

25

26   [10]   The Court notes that this paragraph of the complaint begins by alleging the investigation followed DHS'
instigation of the case, and references a *lack* of investigation by "Defendants": "Following DHS' instigation of this
27   case, Tulare County Sheriff's Department Detective William MacElvaine followed up on the DHS contact by
investigating Plaintiff Osborne online . . . Despite this clear reference to the spiritual or religious use of ayahuasca,
28   neither the Defendants nor Detective MacElvaine did any research into whether the Church or Osborne had a
religious basis for their use of ayahuasca."  (Compl. ¶ 38.)

1   decision primarily on improper venue.  <u>AYA v. Barr I</u>, 2020 WL 5629833, at *14 ("[T]he
2   plaintiffs have not shown, as they must to obtain a pre-enforcement injunction, that there has
3   been any realistic, imminent threat of prosecution or enforcement action by the federal
4   government [and . . .] therefore, have likely not demonstrated that they can succeed on the merits
5   or would suffer irreparable injury absent an injunction . . . however, both motions fail for
6   another, more preliminary reason [of not having] demonstrated a likelihood of success on the
7   merits—or even serious questions going to the merits—because they have not pleaded or shown
8   that venue is proper . . . Plaintiffs may amend the complaint if they believe they can demonstrate
9   that venue here is proper.").  The case was then indeed transferred.  <u>Arizona Yage Assembly v.
10  Barr</u>, No. 3:20-CV-03098-WHO, 2020 WL 6544468, at *1 (N.D. Cal. Nov. 6, 2020) (<u>AYA v.
11  Barr II</u>) ("Transfer is proper because, as my September 21 Order held, I lack personal
12  jurisdiction over some defendants and this is the wrong venue for a suit against the others . . . it
13  appears that venue—as well as personal jurisdiction—lies in the District of Arizona.").

14      The Court finds the case not wholly persuasive given the tenor of its analysis to the facts
15  there, and distinguishable given there *was* a seizure by the federal government here.  Thus the
16  case's discussion does not provide an analogous comparison, even taking that analysis taken in
17  the early stage of that case.  Again, a critical leg of the Defendants' argument was knocked out,
18  concerning the date of incorporation, and thus the Defendants' primary argument no longer has
19  its initially proffered foundation.  Further and significantly, after transfer to Arizona, when issues
20  were fully considered by the new court and amended pleadings were on file, the court found the
21  plaintiffs stated a claim.  See <u>AYA v. Garland II</u>, 2023 WL 3246927, at *5.

22      Similar to part of Defendants' arguments above relating to standing, and additionally the
23  alternative request for stay below, Defendants argue under 12(b)(6) that the complaint fails to
24  state a claim because, fundamentally, all of Plaintiffs' grievances stem from their failure to
25  obtain, much less apply for, a registration through DEA's exemption process.  Defendants argue
26  that to prevail on the RFRA claim, Plaintiffs must demonstrate how DEA's exemption process
27  substantially burdens their allegedly sincere exercise of religion, and Plaintiffs have not
28  attempted to plead such burden.

1   The Court rejects this argument.  Defendants try to require such pleading of a burden,
2   somewhat similar to <u>AYA v. Garland II</u>, where "Defendants tr[ied] to re-cast Plaintiffs' alleged
3   'burden' as one imposed by the DEA's exemption process, [but] that was not how Plaintiffs
4   made their allegations in the [] Complaint."  2023 WL 3246927, at *5.  The <u>AYA v. Garland II</u>
5   court emphasized plaintiffs instead alleged that they were "burdened by the CSA's complete ban
6   on ayahuasca use and importation . . . not by the exemption process outlined by DEA's Guidance
7   . . . [and] alleged multiple seizures of ayahuasca shipments, which [the court found] interrupts
8   their free exercise of religion because they cannot use the ayahuasca that has been seized."  <u>Id.</u>
9   The court found such allegations "sufficient to state a claim under RFRA."  <u>Id.</u>

10   Rather than recasting the alleged burden in relation to the exemption process, Defendants
11   now attempt to have the Court hold Plaintiffs must allege the exemption process *is* the
12   substantial burden, if they have not attempted to utilize the exemption process.[11]  The Court
13   rejects this request.  Defendants' case law does not convince the Court to hold Plaintiff must
14   allege a substantial burden in relation to the exemption process, largely due to the reasons
15   expressed above in relation to the lack of an exhaustion requirement and the Ninth Circuit's
16   discussion in <u>Oklevueha I</u>.

17   The Court finds the cases cited by Defendants to be distinguishable from the
18   circumstances here, and thus do not sway the Court from the more direct holding in <u>Oklevueha I</u>,
19   that was issued after the exemption process was created.  <u>Tawahongva</u> involved the criminal
20   prosecution of an individual in relation to an eagle feather permit system.  <u>United States v.</u>
21   <u>Tawahongva</u>, 456 F. Supp. 2d 1120, 1131 (D. Ariz. 2006).  Significantly, the defendant's
22   challenge there was to the actual permit system and the way the tribe administered the permit
23   system.  <u>Id.</u> ("Defendant alleged in his motion to dismiss that the Hopi tribal government does
24   not fairly administer the process of distributing permits to take golden eagles . . . [h]owever, at
25   the evidentiary hearing Defendant apparently abandoned this argument by not presenting any

---

26
27   [11]  As noted above, Plaintiffs do aver in the complaint that they should not have to endure the exemption process.
      (Compl. ¶ 98.)  However, Plaintiffs in the next paragraph expressly state that: "[t]he issue is not whether petitioning
28   the DEA for an exemption from the CSA imposes a substantial burden but whether the confiscation, destruction and
      prohibition of Plaintiffs' sacrament and the continued threat of these are a substantial burden."  (Compl. ¶ 99.)

1    evidence of how the system of allocating permits by the Cultural Preservation Office was

2    corrupted.").  The court stated that while it was "sympathetic to the conflicts within the Hopi

3    community with regard to 'traditional' and 'non-traditional' Hopi individuals and their view of

4    the validity or invalidity of the system of tribal government currently in place," the court was

5    "not the appropriate venue for the resolution of political and cultural issues among Hopi people."

6    Id. at 1132.  The court held "[a]lthough other federal courts have determined that requiring an

7    American Indian to acquire a permit prior to taking an eagle for religious purposes constitutes a

8    substantial burden on their free exercise of their religion, this Defendant has not presented

9    sufficient evidence the permit requirement 'substantially' burdens his personal free exercise of

10   his religion."  Id.  Thus, similar to the eagle feather permit cases discussed above, the Court finds

11   the case distinguishable as a direct challenge to the actual permit system, where the tribal

12   organization actually ran its own system of issuing permits for religious purposes.   Id.

13   ("Defendant's free exercise of his religion, although slightly burdened, is not substantially

14   burdened by the requirement that he acquire a permit from the Hopi tribe prior to collecting an

15   eagle.").[12]

16        Defendants state Plaintiffs attempt to plead around the exemption process by pointing to

17   two prior instances where the Supreme Court (O Centro, 546 U.S. at 426, in 2006), and the

18   District of Oregon (Church of the Holy Light, 615 F. Supp. 2d at 1219, in 2009), granted RFRA

19   relief to two churches, but contend Plaintiffs "cannot simply point to other groups who have won

20   accommodations . . . and say 'we'll have what they're having.' "  United States v. Christie, 825

21   F.3d 1048, 1061 (9th Cir. 2016).  However, significant to the Ninth Circuit's statement in

22   Christie was the fact the court found the government had shown material differences between the

23   religious groups:  825 F.3d at 1061 ("Christies cannot simply point to other groups who have

24

---

25   [12]  Similarly, other cases Defendants cite to involved challenges to criminal prosecutions related to an eagle feather
     permit system, and a bushmeat permit system, and direct challenges to the established permit system for the
26   particular items.  See United States v. Friday, 525 F.3d 938, 947–48 (10th Cir. 2008) ("We are skeptical that the
     bare requirement of obtaining a permit can be regarded as a 'substantial burden' under RFRA, at least in this case.");
27   see also United States v. Manneh, 645 F. Supp. 2d 98, 116 (E.D.N.Y. 2008) (denying motion to dismiss indictment
     and noting "[c]ourt's conclusion on sincerity overlap with the themes addressed in substantial burden analysis,
28   particularly the lack of any nexus between defendant's asserted beliefs about the religious significance of bushmeat
     consumption and the requirement that she obtain a permit before importing it.").

won accommodations for the sacramental use of peyote and *hoasca* and say 'we'll have what they're having,' because the government has shown material differences between those particular groups and their sacramental practices, on the one hand, and the Christies and their religious exercise, on the other.").  Defendants have not demonstrated legally significant differences between the groups and their sacramental practices at this stage as to warrant departure from the applicable case law discussed above, in relation to the Plaintiffs' allegations taken as true for purposes of the motion to dismiss.

Defendants next argue that relevant circumstances, as well as the Government's position, have drastically changed.  (Mot. 20.)  Specifically, Defendants note that in 2006, it was the Government's "central submission" that it had "a compelling interest in the *uniform* application of the Controlled Substances Act, such that no exception to the ban on use of the hallucinogen can be made to accommodate the sect's sincere religious practice."  O Centro, 546 U.S. at 423 (emphasis in original).  After the Supreme Court rejected that position, the DEA implemented a religious-exemption process that was not yet in place by the time the complaint was filed in 2008.[13]  While the complaint in Oklevueha may have been filed before the implementation of the system, the Ninth Circuit did not rest its decision on such fact, and considered the exemption process generally, and found RFRA does not contain an exhaustion requirement.  See Oklevueha I, 676 F.3d at 838 ("Likewise, we are unpersuaded by the Government's assertion that Plaintiffs' request for prospective relief is unripe because Plaintiffs did not request an exception to the CSA from the DEA.").  Further, while the church in Soul Quest did apply for and was rejected an exemption, such case also does not sway the Court in the face of Oklevueha I.  See Soul Quest Church of Mother Earth, Inc. v. Att'y Gen., No. 6:20-CV-701-WWB-DCI, 2022 WL 1131202, at *1 (M.D. Fla. Mar. 4, 2022) ("In August 2016, the Drug Enforcement Administration ("DEA") directed Plaintiffs to file a petition for religious exemption for the use of ayahuasca . . . Plaintiffs

---

[13]  Defendants' citation is somewhat confusing, in that they cite Oklevueha I, 676 F.3d at 835, but use the parenthetical "(9th Cir. 2010)," (Mot. 20-21), perhaps to reference the fact the Government's motion to dismiss there was filed in 2010, when the Ninth Circuit's decision at this citation, was issued in 2012.  See Oklevueha, 676 F.3d at 838 (9th Cir. 2012).  Defendants similarly note the complaint in Church of the Holy Light of the Queen v. Holder, No. 08-cv-03095 (D. Or. Sept. 5, 2008), ECF No. 1, was filed prior to the 2009 Guidance.  Thus the argument is that both these churches lacked the administrative vehicle now available to Plaintiffs and others like them.

1  petitioned the DEA for a religious exemption . . . the DEA denied Plaintiffs' application . . . [a]s

2  a result, Plaintiffs seek declaratory and injunctive relief against Defendants pursuant to the

3  Religious Freedom Restoration Act.").

4        Accordingly, for the above reasons, the Court finds Plaintiffs have sufficiently alleged the

5  application of the CSA would substantially burden a sincere religious exercise, and the Court

6  shall deny Defendants' 12(b)(6) motions to dismiss.  See O Centro, 546 U.S. at 428; Church of

7  the Holy Light, 615 F. Supp. 2d at 1219; AYA v. Garland II, 2023 WL 3246927, at *5.

8        **E.**      **The Court Denies Defendants' Alternative Request to Dismiss without**
9                   **Prejudice or Stay to Allow for Plaintiffs to Engage DEA Exemption Process**

10        Finally, Defendants argue that as an alternative basis for resolving the instant motion, as a

11  matter of judicial economy and sensible governance, the Court should afford DEA the

12  opportunity in the first instance to evaluate Plaintiffs' eligibility for such an exemption, including

13  determining whether Plaintiffs' current importation and distribution procedures adequately

14  protect against the risk of diversion of a controlled substance and otherwise are in the public

15  interest.  Defendants proffer that dismissing the instant complaint without prejudice—or staying

16  the case while affording DEA an opportunity to evaluate Plaintiffs' claims—strikes the proper

17  balance between "the agency's interest in applying its expertise, correcting its own errors,

18  making a proper record, and maintaining an efficient, independent administrative system" and

19  Plaintiffs' interest "in finding adequate redress."  Morrison-Knudsen Co. v. CHG Int'l, Inc., 811

20  F.2d 1209, 1223 (9th Cir. 1987).  Defendants proffer nothing precludes the Court from doing so,

21  because even where there is no administrative exhaustion requirement, courts have discretion to

22  decline to exercise review on administrative exhaustion grounds.  See McCarthy v. Madigan, 503

23  U.S. 140, 144 (1992).

24        "The doctrine of exhaustion of administrative remedies is one among related doctrines—

25  including abstention, finality, and ripeness—that govern the timing of federal-court

26  decisionmaking."  McCarthy, 503 U.S. at 144.  "Of 'paramount importance' to any exhaustion

27  inquiry is congressional intent.  Id. (citing Patsy v. Board of Regents of Florida, 457 U.S. 496,

28  501 (1982)).  "Where Congress specifically mandates, exhaustion is required . . . [b]ut where

Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy, 503 U.S. at 144 (citations omitted).   'Nevertheless, even in this field of judicial discretion, appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme." Id.

Defendants argue dismissal without prejudice or a stay is warranted based on the three factors articulated in United States v. California Care Corporation, 709 F.2d 1241, 1248 (9th Cir. 1983) ("[T]he judicially created doctrine of exhaustion may stay judicial intervention [and courts] may still require exhaustion if: (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.")   Defendants argue: (1) DEA has the "agency expertise" in diversion prevention "to generate a proper record and reach a proper decision" regarding possible accommodations; (2) allowing Plaintiffs to skip the straightforward step of applying for a religious exemption from DEA "would encourage the deliberate bypass of the administrative scheme" that DEA has established; and (3) requesting an exemption from DEA may "preclude the need for judicial review" thereby preserving the resources of the parties and the Court.

The Court disagrees that "agency consideration" is "*necessary* to generate a proper record and reach a proper decision," in this case.  California Care, 709 F.2d at 1248 (emphasis added). This is not a challenge to the exemption system itself.  Consideration of the guidance factors is not necessary to determine whether application of the CSA would substantially burden Plaintiffs' sincere religious exercise.  See 42 U.S.C § 2000bb-1(a)-(b), (c) ("A person whose religious exercise has been burdened in violation of this section *may assert that violation as a claim* or defense *in a judicial proceeding* and obtain appropriate relief against a government.") (emphasis added).

Not requiring use of the exemption process may encourage bypass of the administrative scheme, however, the Court finds the decision in Oklevueha I significant in this regard, as well

as the absence of an administrative scheme in relation to the statutory text.  In other words, the Court does not view DEA Guidance document as a significant administrative scheme in overall context.  See McCarthy, 503 U.S. at 144 ("[E]ven in this field of judicial discretion, appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme.").  Defendants have not demonstrated that the DEA's exemption process is consistent with congressional intent as to the applicable statutory scheme.  See 42 U.S.C § 2000bb-1(a)-(c); 42 U.S.C. § 2000bb-3(a) ("This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."); 42 U.S.C. § 2000bb-3(b) ("Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter."); 42 U.S.C. § 2000bb-3(c) ("Nothing in this chapter shall be construed to authorize any government to burden any religious belief.").  In this regard, the Court also finds some support from Plaintiffs' suggestion that "[i]f every governmental agency decided that it was empowered to regulate religion or any other fundamental right without statutory authorization, chaos would inevitably ensue," (Opp'n 22 n.16), and that RFRA makes it clear that it is the courts that make that decision, 42 U.S.C. § 2000bb–1(c).  See Ankenbrandt v. Richards, 504 U.S. 689, 705 (1992) ("[T]he federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.' " (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976))).  Further, Defendants have not refuted the Plaintiffs' proffer that no exemption for ayahuasca has been granted.

Although possible, the Court is also not convinced "administrative review is likely to . . . preclude the need for judicial review."  California Care, 709 F.2d at 1248.  First, the Court notes the exemption process may preclude claimants from obtaining a preliminary form of relief to protect their religious practices during the exemption process.  See DEA Guidance at 2 ("**Activity Prohibited Until Final Determination.**  No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been

1    granted and the petitioner has applied for and received a DEA Certificate of Registration.").

2    Further, the guidance allows for suspension or revocation, without detailed separate guidelines or

3    specific protections except for aversion to general principles.  See id. ("A registration granted to

4    a petitioner is subject to subsequent suspension or revocation, where appropriate, consistent with

5    CSA regulations and RFRA.")  This last aspect also makes it somewhat unclear whether even if

6    an exemption were granted, it would not thereafter be summarily removed, and thus further not

7    clear such agency review would likely preclude the need for judicial review at some point.[14]

8         Therefore, for the reasons discussed in this section, as well as related reasons the Court

9    already addressed when discussing Defendants' similar arguments above, the Court declines the

10   alternative request to dismiss this case without prejudice, or stay this action, to require Plaintiffs

11   to apply for an exemption through the DEA's exemption process.

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   _____

[14]  The Court finds some additional support to reject a stay based on Plaintiffs' argument that stays should not be
granted unless it appears likely the other proceedings will be concluded within a reasonable time.  See Dependable
Highway Exp., Inc. v. Navigators Ins. Co., 498 F.3d 1059, 1066–67 (9th Cir. 2007) ("Thus, in light of the general
policy favoring stays of short, or at least reasonable, duration, the district court erred by issuing a stay without any
indication that it would last only for a reasonable time."); Leyva v. Certified Grocers of California, Ltd., 593 F.2d
857, 864 (9th Cir. 1979) ("A stay should not be granted unless it appears likely the other proceedings will be
concluded within a reasonable time in relation to the urgency of the claims presented to the court.").  Plaintiff
proffers that after a four-year process, one applicant, Soul Quest Church of Mother Earth, Inc. ("Soul Quest") was
denied an exception partly on the basis that "Soul Quest has not satisfied its burden under RFRA of demonstrating
that its use of ayahuasca is pursuant to a religious exercise and based on a sincerely held religious belief." (See
Opp'n 21-22; Silver Decl. ¶18, Exhibit C, ECF No. 16-1 at 33.)  Defendants emphasize the court there did grant a
stay to adjudicate the application for exemption.  The Court notes that the stay was requested and granted, where the
church had applied for the exemption prior to the filing of the federal action.  While Defendants emphasize it only
then took 10 months to issue a decision after the stay was granted, the decision did not issue from the DEA until
more than three and a half years after the initial application was filed.  Soul Quest Church of Mother Earth, Inc. v.
Att'y Gen., No. 6:20-CV-701-WWB-DCI, 2022 WL 1131202, at *1 (M.D. Fla. Mar. 4, 2022) ("In August 2016, the
Drug Enforcement Administration ("DEA") directed Plaintiffs to file a petition for religious exemption for the use
of ayahuasca . . . on August 21, 2017, Plaintiffs petitioned the DEA for a religious exemption . . . [and] [o]n April
16, 2021, the DEA denied Plaintiffs' application.").

1

**V.**

**ORDER**

For all of the above explained reasons, Defendants' Rule 12(b)(1) motion to dismiss for lack of standing; Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim; and Defendants' motion to alternatively dismiss without prejudice or stay this action, shall be denied.

Accordingly, IT IS HEREBY ORDERED that Defendants' motion to dismiss (ECF No. 12), is DENIED.

IT IS SO ORDERED.

Dated:   **January 9, 2024**

_____
UNITED STATES MAGISTRATE JUDGE